GILBERT C. RUSSELL, APPELLANT, v. DANIEL R. SOUTHARD, SAMUEL D. TOMPKINS, AND WILLIAM C. BULLETT AND WILLIAM H. POPE, ADMINISTRATORS OF JAMES BURKS, DECEASED, WILLIAM L. THOMPSON, GUARDIAN TO JAMES BURKS, SAMUEL BURKS, CHARLES BURKS, AND NANCY BURKS, INFANT CHILDREN OF JAMES BURKS, DECEASED, MATILDA BURKS AND JOHN BURKS, HEIRS OF SAID JAMES BURKS, DECEASED.

When the question before a court of equity is, whether a deed which purports upon its face to be an absolute deed, was in reality a deed or a mortgage, extraneous evidence is admissible to show that it was only a mortgage.

Upon such a question as this, depending upon the general principles of equity jurisprudence, this court does not hold itself bound by the decisions of the highest court of the state in which the land in question was, but will be governed by its own view, of those principles.

The decisions of the courts of Kentucky examined.

Such evidence is admissible when it is alleged and proved that a loan on security was really intended and the defendant sets up the loan as a payment of purchase-money and the conveyance as a sale.

In examining the question whether the transaction was a sale or mortgage, it is of great importance to inquire whether the consideration was adequate to induce a sale.

In the present case, the court decides, from the evidence, that the consideration was grossly inadequate ; that he was a stranger, without friends or other resources there than the land in question ; that it is true he offered to sell, but there is no evidence to show that he offered to sell for the amount of money which he actually received.

The papers executed between the parties show a conditional sale ; but in doubtful cases the court leans to the conclusion that the reality was a mortgage and not a sale.

The absence of a personal obligation by the grantor to repay the money furnishes no conclusive test to determine whether the conveyance was a mortgage or a conditional sale.

Nor do the facts that the grantor endeavored to obtain the relinquishment of his wife's dower, and actually surrendered the paper under which he had the right to reclaim his land, amount to a bar of his claim, under the circumstances of this case.

Three years after the transaction the grantor received one hundred dollars from the grantee upon the ground of an arithmetical error, and signed a release of all further demands. But apart from other considerations bearing upon the purchase of an equity of redemption, in the present case it was the duty of the grantee to correct errors, and consequently he paid nothing for the equity of redemption.

Where there was a long lapse of time and the original mortgagee had been dead for many years, an account of rents and profits and of interest upon the money loaned, will be decreed to commence from the filing of the bill.

Where there were purchasers during the intermediate time, and the record did not enable this court to determine upon their rights, the case will be remanded to the Circuit Court for its adjudication thereon.

A motion made in this court after the decision of the case here, to set aside the decree and remand the case to the Circuit Court for further preparation and proof, upon the ground that new and material evidence has beeen discovered since the trial of the case in that court, — cannot be sustained.

Affidavits of newly-discovered testimony cannot be received. This court must affirm or reverse upon the case as it appears upon the record.

The established chancery practice is so, and if it were not, the act of Congress, passed on March 3, 1803, would be decisive of the question.

THIS was an appeal from the Circuit Court of the United States for the District of Kentucky, sitting as a court of equity.

Russell v. Southard et al.

It was a bill filed by Russell, the appellant, to redeem what he called a mortgage, and the question in the case was whether it was a mortgage or conditional sale. The facts are set forth in the opinion of the court. Upon the trial, the Circuit Court dismissed the bill, and Russell appealed to this court.

It was argued by *Mr. Underwood* and *Mr. Morehead,* with whom was *Mr. Clay,* for the appellant, and by *Mr. Nicholas* for the appellee.

The counsel for the appellant made the following points:

1. That the execution of a defeasance simultaneously with the absolute conveyance, constitutes them, in legal contemplation, one instrument; and that in this case the execution of the defeasance was so. 3 J. J. Marsh. 354; Powell on Mortg. 67.

2. That in all doubtful cases the law will construe the contract to be a mortgage, and that courts are less inclined to consider a contract for land a conditional sale than the same kind of contract for personalty; because land is not so liable to the casualties incident to personal, and especially living property. The general and governing principle in this entire class of cases is, that whatever clauses or covenants there are in a conveyance, though they seem to import an absolute disposition or conditional purchase, yet if, upon the whole, it appears to have been the intention of the parties that such conveyance should only be a mortgage, or pass an estate redeemable, a court of equity will construe it so. 5 Bac. Ab. 5. In the case of Edrington *v.* Harper, decided by the Court of Appeals of Kentucky, 3 J. J. Marsh. 354, the general rule is laid down, that if there be no other fact to illustrate the intention of the parties, but an absolute sale on one side and a defeasance on the other, the court will incline to the construction that the contract was a mortgage.

In the case of Flagg *v.* Mann, 2 Sumner, 535, the same doctrine is ably enforced; the presiding judge, in the course of his decision, remarking that "it is well known that courts of equity lean against construing contracts of this kind to be conditional sales; and, therefore, unless the transaction be clearly made out to be of that nature, it is always construed to be a mortgage," and concluding that "the *onus probandi* is on the defendant to establish it to be a conditional sale. If it be doubtful, it must be construed to be a mortgage."

3. That a sale in form, but which in fact and substance may be avoided by the payment of money within a given time, is, and will be held to be, a mortgage; if a mortgage until that period elapses, it must continue a mortgage until lapse of time or some other matter changes it. Wheeland *v.* Swartz, 1 Yeates, 579; Stoever *v.* Stoever, 9 Serg. & Raw. 434; Wharf *v.*

Russell v. Southard et al.

Howell, 5 Binney, 499; Dimond v. Enoch, Add. 356; Coldwell v. Woods, 3 Watts, 188; Friedly v. Hamilton, 17 Serg. & Rawle, 70; 7 W. & Ser. 339; Kunkle v. Wolfersberger, 6 Watts, 126; Kerr v. Gilmore, Ib. 405; Rankin v. Mortimere, 7 Watts, 372; Brown v. Nickle, 6 Barr, 390; Hamet v. Dundass, 4 Barr, 178; Flagg v. Mann, 2 Sumner, 532; Skinner v. Miller, 5 Litt. 85; Hardin, 6; 2 J. J. Marsh. 471; 3 J. J. Marsh. 354; 1 Dev. Eq. 373; 2 Call, 421; 2 Mon. 40; 1 Wash. 125; 4 Hen. & Munf. 161; 3 Yerger, 525; 2 Haywood, 26; 2 Edwards, 138; 7 Johns. Ch. 40; 2 Id. 34, &c.; 6 Watts, 406, where the cases are reviewed.

4. That the simultaneous execution of the deed and an instrument giving four months to repay the money, with interest, no matter what may be the clauses or covenants intended to restrict the redemption to this precise period, necessarily import the loan of money on one side and security on the other, and, if so, a court of equity will always construe it a mortgage.

5. That calling it a conditional sale does not make it so; and that the extraordinary language used in this case, so far from making it such, tends strongly to show that the spirit and real substance of the contract were understood, but attempted to be avoided by the artful dress thrown around the transaction.

The counsel then examined the extrinsic evidence bearing upon these points, of which it is impossible to give an abstract.

6. Whether, construing this transaction as a mere security for money advanced, any subsequent event has deprived the complainant of his right to redeem? The giving up the defeasance and execution of the receipt, it is insisted, amounted to a relinquishment or release of the equity of redemption. Russell called on Southard, after the period stipulated for redemption, to make good the advance mentioned in the deed. The receipt recites the several sums which, with the addition of this $100, make the amount stated in the deed, and concludes by saying it was in full of all demands. According to the face of the papers, Russell was allowed to redeem only by paying $4,929.81, whereas he had only received $4,829.81. He insisted on the $100 to make the sum he received equal to the obligation he had imposed on himself. This is so clearly shown by the receipt itself that it would be useless to enlarge upon it. The words at the end of the receipt, " This is in full of all demands upon J. Southard," can only be construed as having reference to moneyed claims. Russell, after the receipt of the $100, had no demand upon Southard, and it only increased by that sum the demand which Southard held on him. Increasing the sum which Russell was equitably bound to pay, if it be considered a mortgage, and releasing all further demands on the mortgagee,

cannot be construed as destroying the liability which the advance only enlarged, and the right to redeem must consequently be considered as unaffected by the receipt. The giving up the defeasance at the same time was, therefore, without consideration.

Admitting, however, that it was an attempt on the part of Southard to extinguish the right to redeem, will a court of equity sanction it?

The civil law was, perhaps, more rigid on this point than ours, regarding, as it did, the mortgagor as a minor, and as having no will to do a valid act which would deprive him of the right to redeem. Our courts of equity have never gone to this extent, but they always look upon any act done under the influence resulting from the relation between mortgagor and mortgagee with great suspicion, and never fail to examine it with the severest scrutiny. It is not denied that the mortgagee may purchase the equity of redemption for a fair price and full consideration, under circumstances where the mortgagor could exercise a will unembarrassed by necessity. A court of equity will never sanction an arrangement by which the right of redemption is surrendered without adequate consideration. St. John v. Turner, 2 Vern. 418; 1 Ridgeway, 295; Powell on Mortgages, 122, note n; Holdridge v. Gillespie, 2 Johns. Ch. 30; Henry v. Davis, 7 Johns. Ch. 41; 2 Cowen, 322; 2 Day, 246; 1 Murphey, 117; Hicks v. Hicks, 5 Gill & Johns. 75.

7. With respect to lapse of time, the suit was commenced within twenty years of the date of the original transaction, and within less than seventeen years after the advance of the $100.

The points made by *Mr. Nicholas* were the following:

1. Does the written proof concerning the agreement show a conditional sale or a mortgage?

Over and above the unequivocal express language of the agreement itself, that it is, and was intended to be, a conditional sale from Southard, and not in the nature of a mortgage from Russell, there is the absence of any of those *indicia*, upon which courts rely in construing a *quasi* conditional sale to be a mortgage or security for a loan.

1st. There is no agreement, express or implied by Russell, to pay the $4,900.

2d. There is no acknowledgment, express or implied, which imports, or from which there could be inferred, an indebtedness from Russell to Southard. There is nothing creating any personal liability upon Russell, or by which Southard could have coerced the payment of the $4,900. There is nothing on the face of the writings importing a loan, or any thing else than

what they purport to be, the evidence of a conditional or defeasible sale.

There is, therefore, the want of that mutuality in the agreement, which, according to all the approved authorities, is indispensable to the construing of a conditional sale into a mortgage. Robinson v. Cropsey, 2 Edw. Ch. R. 138; 19 Wend 518.

The legality of these sales is, at this day, beyond all doubt, even if there ever was room for a fair legal doubt on the subject. " To deny it," (says Ch. J. Marshall, delivering the opinion of the whole court, in Conway v. Alexander, 7 Cranch, 236,) " would be to transfer to a court of chancery, in a considerable degree, the guardianship of adults as well as infants." In Flagg v. Mann, 14 Pick. 480, the court says: " Such a contract is known and recognized in law, and is as much to be enforced as is a mortgage, or any other contract or agreement. A decision to the contrary would essentially, unnecessarily, and unjustly fetter and impair the right to manage and dispose of property, according to the wants and interests of the owners." In Glover v. Payne, 19 Wend. 522, the Supreme Court of New York says: " Until the courts are prepared to make contracts for parties, and to assume the guardianship of adults as well as infants, such a contract cannot be declared a mortgage." " Conditional sales, or defeasible purchases," says Chancellor Kent, " though narrowly watched, are valid, and to be taken strictly as independent dealings between strangers; and the time limited for the repurchase must be precisely observed, or the vendor's right to reclaim his property will be lost. The court never relieves the grantor who neglects to perform the condition on which the privilege of repurchase depends."

The obvious reason for this departure from the ordinary chancery rule, in requiring such strict performance of the condition is, because there would otherwise be no mutuality in the agreement. The conditional vendee would be allowed to speculate on the chances of a rise in the value of the property, by lying by an indefinite time before he made his election to redeem, whilst the vendor had no power to compel a redemption. For the same reason, the want of power to coerce the payment of the purchase-money, is held by all the authorities as a controlling circumstance against construing a conditional sale into a mortgage. Some of the earlier authorities say, that want of mutuality is not an unanswerable argument, and some *dicta* in more modern decisions seem to recognize that doctrine; but it is believed that no case of approved authority can be found within the last seventy years, construing a conditional sale into a mortgage, where such mutuality did not exist. 19 Wend. 522; 1 A. K. Marsh. 169.

The written proof in this case shows "no previous debt or dealing, no loan in contemplation, no stipulation for the repayment of the money advanced, or right to coerce it, and no proposition for a treaty about a mortgage," but does most clearly negative each of those propositions. We may, therefore, safely conclude, that the agreement cannot be construed into a mortgage from the written evidence in the cause.

2. The next inquiry is, — can parol proof be let in, to contradict or vary the construction of the written agreement, for the purpose of converting it into a mortgage?

The familiar general rule is, that this cannot be done either at law or in chancery. The exception to the rule at law is, where the parol proof is offered to establish alleged fraud in obtaining the agreement, or some vice or illegality in its consideration. Chancery allows the further exception, where a party comes to obtain the correction of an alleged mistake in the construction of the agreement. These are the only exceptions allowed in either court. In every other instance the rule is inflexible and invariable in its rigid application.

It might be inferred, from the loose language of some respectable authorities, and the case of Conway v. Alexander, (7 Cranch,) is among the number, that the letting in of parol proof, to establish the loan of money in this class of cases, without any charge of usury, was an additional exception. But it is believed never to have been so decided, where that was the turning point in the case. The contrary has been expressly and repeatedly decided by the Appellate Court of Kentucky, and such has long been the settled law of that State. In 1824, that court, composed of those eminent jurists, Boyle, Owsley, and Mills, after acknowledging that there had been difference of decisions in that court, as elsewhere, on the question, determined that the parol proof could not be allowed. The rule, thus settled, has constantly been enforced ever since. It has become a law of property in Kentucky. Its direct, and indirect recognition, can be found in at least twenty printed cases. In 1829, when there was a change in the members of the court, the rule was solemnly affirmed in the strongest manner, in Fishback v. Woodford, 1 J. J. Marsh. 87. Again, in 1839, when there was another change in the members of the court, and it was composed of judges Robertson, Ewing, and Marshall, an effort was made to convert an absolute deed into a mortgage, by parol proof, without charge of accident or mistake, and the rule was reaffirmed in the following language, in Thomas v. McCormack, 9 Dana, 109.

"There being no written memorial of any condition or defeasance, neither the public interest, nor the established principles of jurisprudence, will allow a court of either equity or law to

admit parol testimony, in opposition to the legal import of the deed, and the positive denial in the answer, unless a foundation for such evidence had been first laid by an allegation, and some proof of fraud or mistake in the execution of the conveyance, or of some vice in the consideration. This rule, though it may operate harshly in a particular case, is, nevertheless, so salutary and conservative, that an inflexible adherence to it is necessary for effectuating the policy of the statute of frauds; and of giving proper security to property, and full effect to solemn contracts in writing." " To admit such testimony, would operate a mischievous relaxation of wholesome rules of law, open a wide door to perjury, and greatly impair, if not altogether destroy, the efficacy and value of written memorials of contracts."

3. If correct in this position, then the complainant must fail, as there is no foundation laid for letting in any parol proof, to show the original transaction to have been a mere loan and intended security for its repayment.

4. The next question is, whether Russell is not bound by his release under seal.

5. The next question is, does the parol proof establish, in contradiction to the writings, that the parties intended a mortgage, and not a conditional sale?

The claim to the relief sought here should be sustained by the fullest and most indisputable proof, because of its staleness; because it is in contradiction to the written agreement of the parties, fairly made; because it is asserted long after the death of James Southard, the principal party, and that of Warden Pope, the intelligent and respectable draftsman of the agreement; because, no sufficient excuse is even pretended, much less proved, for the long delay; because it is in opposition to Russell's voluntary release, made seventeen years before; and because all the material allegations are positively denied, on oath, by the defendant, Daniel Southard, who is charged to have been personally cognizant of the whole transaction.

Such is not at all the character of the proof. On the contrary, it very strongly corroborates the import of the writings, and tends to show that the parties really intended a conditional sale, and not a mortgage.

The counsel then examined the evidence upon this point.

Mr. Justice CURTIS delivered the opinion of the court.

This is a suit in equity to redeem a mortgage, brought here by appeal from the Circuit Court of the United States for the District of Kentucky.

On the 24th day of September, 1827, Russell, the complainant, conveyed, by an absolute deed in fee-simple, to James Southard,

deceased, whose brother and devisee, Daniel R. Southard, is the principal party defendant in this bill, a farm, containing two hundred and sixteen acres, situated about two miles from the city of Louisville.

At the time the deed was delivered, and as part of the same transaction, Southard gave to Russell a memorandum, the terms of which are as follows:

" Gilbert C. Russell has sold and this day absolutely conveyed to James Southard, said Russell's farm near Louisville, and the tract of land belonging to said farm, containing two hundred and sixteen acres, and the possession thereof actually delivered on the following terms, for the sum of $4,929.81½ cents, which has been paid and fully discharged by the said Southard as follows, viz., first two thousand dollars, money of the United States, paid in hand; secondly, the transfer of a certain claim in suit in the Jefferson Circuit Court, Kentucky, in the name of James Southard against Samuel M. Brown and others, now amounting to the sum of $1,558.87½; and thirdly, the transfer of another claim in the same court, in the name of Daniel R. Southard against James C. Johnston and others, now amounting to the sum of $1,270.94, as by reference to the records of the more precise amounts will more fully appear. The said Gilbert C. Russell has taken, and doth hereby agree to receive from said Southard aforesaid, two claims against Brown, &c., and James C. Johnston, &c., as aforesaid, without recourse in any event whatever to the said James Southard, or his assignor, Daniel R. Southard, of the claim of said Johnston, &c., or either, and to take all risk of collection upon himself, and make the best of said claim he can.

" The said James Southard agrees to resell and convey to the said Russell the said farm and two hundred and sixteen acres of land, for the sum of forty-nine hundred and twenty-nine [dollars] 81½ cents, payable four months after the date hereof, with lawful interest thereon from this date. And the said Russell agrees, and binds himself, his heirs, &c., that if the said sum and interest be not paid to the said James Southard, or his assigns, at the expiration of four months from this date, that then this agreement shall be at an end, and null and void; and the wife of said Russell shall relinquish her dower within a reasonable time as per agreement of this date. This agreement of resale by the said James Southard to the said Russell, is conditional and without a valuable consideration, and entirely dependent on the payment, on or before the expiration of four months from and after the date hereof, of the said sum of $4,929.81½, and interest thereon from this date as aforesaid. And this agreement is to be valid and obligatory only upon the said James

Southard, upon the punctual payment thereof of the sum and interest as aforesaid, by the said Gilbert C. Russell.

" In witness whereof the parties aforesaid, have hereunto set their hands and seals, at Louisville, Kentucky, on this 24th day of September, 1827.         GILBERT C. RUSSELL, [SEAL.]
          JAMES SOUTHARD,        [SEAL.]

" Witness present, signed in duplicate—
        J. C. JOHNSTON."

The first question is whether this transaction was a mortgage, or a sale.

It is insisted, on behalf of the defendants, that this question is to be determined by inspection of the written papers alone, oral evidence not being admissible to contradict, vary, or add to, their contents. But we have no doubt extraneous evidence is admissible to inform the court of every material fact known to the parties when the deed and memorandum were executed. This is clear, both upon principle and authority. To insist on what was really a mortgage, as a sale, is in equity a fraud, which cannot be successfully practised, under the shelter of any written papers, however precise and complete they may appear to be. In Conway v. Alexander, 7 Cranch, 238, C. J. Marshall says: " Having made these observations on the deed itself, the court will proceed to examine those extrinsic circumstances, which are to determine whether it was a sale or a mortgage;" and in Morris v. Nixon, 1 Howard, 126, it is stated: " The charge against Nixon is, substantially, a fraudulent attempt to convert that into an absolute sale, which was originally meant to be a security for a loan. It is in this view of the case that the evidence is admitted to ascertain the truth of the transaction, though the deed be absolute on its face."

These views are supported by many authorities. Maxwell v. Montacute, Precedents in Ch. 526; Dixon v. Parker, 2 Ves. sen. 225; Prince v. Bearden, 1 A. K. Marsh. 170; Oldham v. Halley, 2 J. J. Marsh, 114; Whittick v. Kane, 1 Paige, 202; Taylor v. Luther, 2 Sumner, 232; Flagg v. Mann, 2 Sumner, 538; Overton v. Bigelow, 3 Yerg. 513; Brainerd v. Brainerd, 15 Conn. R. 575; Wright v. Bates, 13 Vermont, R. 341; McIntyre v. Humphries, 1 Hoff. Ch. R. 331; 4 Kent, 143, note A., and 2 Greenel. Cruise, 86, note.

It is suggested that a different rule is held by the highest court of equity in Kentucky. If it were, with great respect for that learned court, this court would not feel bound thereby. This being a suit in equity, and oral evidence being admitted, or rejected, not by the mere force of any State statute, but upon the principles of general equity jurisprudence, this court must be governed by its own views of those principles. Robinson v.

Campbell, 3 Wheat. 212; United States v. Howland, 4 Wheat. 108; Boyle v. Zacharie et al. 6 Pet. 658; Swift v. Tyson, 16 Pet. 1; Foxcroft v. Mallett, 4 How. 379. But we do not perceive that the rule held in Kentucky, differs from that above laid down. That rule, as stated in Thomas v. McCormack, 9 Dana, 109, is that oral evidence is not admissible in opposition to the legal import of the deed and the positive denial in the answer, unless a foundation for such evidence had been first laid by an allegation, and some proof of fraud or mistake in the execution of the conveyance, or some vice in the consideration.

But the inquiry still remains, what amounts to an allegation of fraud, or of some vice in the consideration — and it is the doctrine of this court, that when it is alleged and proved that a loan on security was really intended, and the defendant sets up the loan as a payment of purchase-money, and the conveyance as a sale, both fraud and a vice in the consideration are sufficiently averred and proved to require a court of equity to hold the transaction to be a mortgage; and we know of no court which has stated this doctrine with more distinctness, than the Court of Appeals of the State of Kentucky. In Edrington v. Harper, 3 J. J. Marshall, 355, that court declared : — " The fact that the real transaction between the parties was a borrowing and lending, will, whenever, or however it may appear, show that a deed absolute on its face was intended as a security for money ; and whenever it can be ascertained to be a security for money, it is only a mortgage, however artfully it may be disguised." We proceed then to examine this case by the light of all the evidence, oral and written, contained in the record.

The deed and memorandum certainly import a sale; the question is, if their form and terms were not adopted to veil a transaction differing in reality from the appearance it assumed?

In examining this question it is of great importance to inquire whether the consideration was adequate to induce a sale. When no fraud is practised, and no inequitable advantages taken of pressing wants, owners of property do not sell it for a consideration manifestly inadequate, and, therefore, in the cases on this subject great stress is justly laid upon the fact that what is alleged to have been the price bore no proportion to the value of the thing said to have been sold. Conway v. Alexander, 7 Cranch, 241; Morris v. Nixon, 1 How. 126; Vernon v. Bethell, 2 Eden, 110; Oldham v. Halley, 2 J. J. Marsh. 114; Edrington v. Harper, 3 J. J. Marsh. 354.

Upon this important fact the evidence leaves the court in no doubt. The farm, containing 216 acres, was about two miles from Louisville, and abutted on one of the principal highways

leading to that city.   A dwelling-house, estimated to have cost. from $10,000 to $12,000, was on the land.

In May, 1826, about 16 months before this alleged sale, Russell purchased the farm of John Floyd, and paid for it the sum of $12,960.   Some attempt is made to show, by the testimony of Mr. Thurston, that this sum was not paid as the value of the land; but what he says upon this point is mere conjecture, deduced by him from hearsay statements, and cannot be allowed to have any weight in a court of justice.   There is some conflict in the evidence respecting the state of the fences and the agricultural condition of the lands at the time in question, but we do not find any proof that the lands had been permanently run down, or exhausted; and considering the price paid by Russell, and the amount expended by Wing, his agent, during the sixteen months he managed the farm, we think the evidence shows that, though the fences and buildings were not in the best condition, yet their state was not such as to detract largely from the value of the property.   The consideration for the alleged sale was $2,000 in cash, and the assignment of two claims then in suit, amounting, with the interest computed thereon, to $2,829.81, not finally reduced to money by Russell, till October, 1830, upwards of three years after the assignment.   Making due allowance for the state of the currency in Kentucky at that time, the worst effects of which seem to have been then passing away, and which must be supposed to have affected somewhat the value of the claims he received, as well as of the property he conveyed, we cannot avoid the conclusion that this consideration was grossly inadequate;  and therefore we must take along with us, in our investigations, the fact that there was no real proportion between the alleged price and the value of the property said to have been sold.   We have not adverted particularly to the opinions of witnesses respecting the value of the property, because they have not great weight with the court, compared with the facts above indicated; but there is a general concurrence of opinion that the value of the farm largely exceeded the alleged price.

It appears that Russell had intrusted the care of this farm to an agent named Wing, who had contracted debts for which Russell had been sued, on coming to Louisville from Alabama, where he resided.   He was a stranger, without friends or resources there, except this farm, and in immediate and pressing want of about $2,000 in cash.   Southard, though not proved to have been a lender of money at usurious rates of interest, is shown to have been possessed of active capital, and not engaged in any business except its management.   Russell certainly attempted to sell the farm.   Colonel Woolley testifies, — " Russell

13*

was anxious to sell; indeed he was importunate that I should purchase." And a letter is produced by the defendant, D. R. Southard, written to James Southard, by Wing, containing a proposal for a sale. The letter is as follows:—

> "*Sunday, Noon.*
>
> "Sir: Having had some conversation in relation to Col. Russell's plantation, I will take the liberty of submitting for your consideration, 1st, how much will you give for the place, crops, stock, utensils, and implements, or how much without the same, to be paid as follows: in one sixth cash in hand, the balance in one, two, three, four, and five equal annual instalments, which may be extinguished at any time with whiskey, pork, bacon, flour, hemp, bale rope, cotton bagging, at the New Orleans prices current, deducting therefrom freight accustomary. Mules and fine horses will now be taken at appraised valuation.
>
> "Respectfully, yours, J. W. WING.
>
> Mr. SOUTHARD.
>
> "N. B. Please leave an answer for me at Allan's, say this evening. Yours, &c., J. W. W."

It does not appear that any price was spoken of between Russell and Colonel Woolley, who peremptorily refused to purchase; nor is any sum of money mentioned in this letter of Wing; but, bearing in mind Russell's necessity to have $2,000 in cash, the offer to take one sixth cash, and the balance in one, two, three, four, and five annual instalments, indicates that Russell then expected about $12,000 for the property, and had that sum in view as the price, when these terms were proposed. This offer to sell differs so widely from the terms of the written memorandum, that it certainly does not aid in showing that the actual transaction was a sale. Peter Wood testifies that he heard a conversation between James Southard and Colonel Russell, about the transfer of the farm from Russell to Southard, in which Mr. Southard proposed to advance money to Russell upon the farm; that Russell told Southard about what he had paid for the farm, $13,000 or $14,000, and that he should consider it a sacrifice at $10,000; but no proposal was made to give or take, any price for the farm. That some time after, Southard told him he had advanced Russell between $4,000 and $5,000 on the place, but that, in case he owned the place, it would cost him $10,000. The general character of this witness for truth and veracity is attacked by the defendants, and supported by the plaintiff. His credibility finds support in the consistency of his statements with the plominent facts proved in the case. This is all the proof touching the negotiations which led to the contract; but there is some evidence bearing

directly on the real understanding of the parties. Doctor Johnston was the subscribing witness to the written memorandum. He testifies that "James Southard and Gilbert C. Russell, I think on the same day, presented the agreement, and asked me to witness the same, which I did. My understanding of the contract was both from Southard and Russell, and my distinct impression is, that Russell was to pay the money in four months, and take back the farm." The intelligence and accuracy, as well as the fairness of this witness, are not controverted; and if he is believed, the transaction was a loan of money, upon the security of his farm. It is the opinion of the court that such was the real transaction. The amount and nature of what was advanced, compared with the value of the farm, the testimony of Wood as to the offer of Southard to make an advance of money on the farm, and his subsequent declaration that he had done so, and the information given by both parties to Doctor Johnston, that Russell was to pay the money at the end of four months, present a case of a loan on security, and are not overcome by the answer of Southard and the written memorandum.

It is true, Daniel R. Southard, answering, as he declares, from personal knowledge, sets out, with great minuteness, a case of an absolute and unconditional sale; the written contract by his brother to reconvey being, as he says, a mere gratuity conferred on Russell the next day, or the next but one, after this absolute sale and conveyance had been fully completed. But this account of the transaction is so completely overthrown by the proofs, that it was properly abandoned by the defendants' counsel, as not maintainable. We entertain grave doubts whether, after relying on an absolute sale in his answer, it is open to him to set up in defence a conditional sale; but it cannot be doubted, that the least effect justly attributable to such a departure from the facts, is to deprive his answer of all weight, as evidence, on this part of the case.

In respect to the written memorandum, it was clearly intended to manifest a conditional sale. Very uncommon pains are taken to do this. Indeed, so much anxiety is manifested on this point, as to make it apparent that the draftsman considered he had a somewhat difficult task to perform. But it is not to be forgotten, that the same language which truly describes a real sale, may also be employed to cut off the right of redemption, in case of a loan on security; that it is the duty of the court to watch vigilantly these exercises of skill, lest they should be effectual to accomplish what equity forbids; and that, in doubtful cases, the court leans to the conclusion that the reality was a mortgage, and not a sale. Conway v. Alexander, 7 Cranch, 218;

Flagg v. Mann, 2 Sumner, 533; Secrest v. Turner, 2 J. J. Marsh. 471; Edrington v. Harper, 3 J. J. Marsh. 354; Crane v. Bonnell, 1 Green, Ch. R. 264; Robertson v. Campbell, 2 Call, 421; Poindexter v. McCannon, 1 Dev. Eq. Cas. 373.

It is true, Russell must have given his assent to this form of the memorandum; but the distress for money under which he then was, places him in the same condition as other borrowers, in numerous cases reported in the books, who have submitted to the dictation of the lender under the pressure of their wants; and a court of equity does not consider a consent, thus obtained, to be sufficient to fix the rights of the parties. "Necessitous men," says the Lord Chancellor, in Vernon v. Bethell, 2 Eden, 113, "are not, truly speaking, free men; but, to answer a present emergency, will submit to any terms that the crafty may impose upon them."

The memorandum does not contain any promise by Russell to repay the money, and no personal security was taken; but it is settled that this circumstance does not make the conveyance less effectual as a mortgage. Floyer v. Lavington, 1 P. Wms. 268; Lawley v. Hooper, 3 Atk. 278; Scott v. Fields, 7 Watts 360; Flagg v. Mann, 2 Sumner, 533; Ancaster v. Mayer, 1 Bro. C. C. 464. And consequently it is not only entirely consistent with the conclusion that a mortgage was intended, but in a case where it was the design of one of the parties to clothe the transaction with the forms of a sale, in order to cut off the right of redemption, it is not to be expected that the party would, by taking personal security, effectually defeat his own attempt to avoid the appearance of a loan.

It has been made a question, indeed, whether the absence of the personal liability of the grantor to repay the money, be a conclusive test to determine whether the conveyance was a mortgage. In Brown v. Dewey, 1 Sandf. Ch. R. 57, the cases are reviewed and the result arrived at, that it is not conclusive. It has also been maintained that the proviso, or condition, if not restrained by words showing that the grantor had an option to pay or not, might constitute the grantee a creditor. Ancaster v. Mayer, 1 Bro. C. C. 464; 2 Greenl. Cruise, 82 n, 3. But we do not think it necessary to determine either of these questions; because we are of opinion that in this case there is sufficient evidence that the relation of debtor and creditor was actually created, and that the written memorandum ascertains the amount of the debt, though it contains no promise to pay it. In such a case it is settled, that an action of assumpsit will lie. Tilson v. Warwick Gas-Light Co. 4 B. & C. 968; Yates v. Aston, 4 Ad. & El. N. S. 182; Burnett v. Lynch, 5 B. & C. 589; Elder v. Rouse, 15 Wend. 218.

Some reliance was placed on the facts, that in August, 1830, the plaintiff wrote a letter to his wife requesting her to release her dower, and that, in October, 1830, Russell surrendered the written memorandum, under circumstances which will be presently stated. It is urged that these acts show he understood the original transaction was not a mortgage. But the utmost effect justly attributable to these acts is, that Russell thought he then had no further claim to the property, and this belief may as well have arisen from the terms of the memorandum, as from his knowledge that a sale was intended. In our judgment, however, these acts, taken in connection with other facts proved, do not tend to support the defendants' case. Russell had, by his written contract to procure the release of his wife's dower, subjected himself to pay liquidated damages to the extent of three thousand dollars; and he might desire to escape from this liability by having his wife release her right, even if he then believed he had a right to redeem and expected to redeem; for, in that event, such release could do neither him nor his wife any harm. But, on the other hand, if he then thought he had no such right, it would be a balancing of disadvantages to have such a release made, and the question would be, whether the right of dower was more important than the liability to damages. And, as to the surrender of the written memorandum in October following, it appears, from the testimony of Colonel Woolley, that Russell, even after this surrender, thought he had a just right of redemption, though he undoubtedly believed that it was greatly embarrassed, if not lost, by his failure to pay on the stipulated day and by his relinquishment of the written memorandum.

The conclusion at which we have arrived on this part of the case is, that the transaction was, in substance, a loan of money upon the security of the farm, and being so, a court of equity is bound to look through the forms in which the contrivance of the lender has enveloped it, and declare the conveyance of the land to be a mortgage.

Being of opinion that this was in its origin a mortgage, the next inquiry is, whether the right of redemption has been extinguished. In October, 1830, Russell was temporarily in Louisville, and, while there, called on Southard, and informed him there was a mistake of one hundred dollars in the computation of the amount due on the claims assigned to him. Southard insisted it was the mistake of W. Pope, who, he said, was Russell's agent, and that he, Southard, was not liable to make it good. He also set up a claim that he had a right to redeem, or, as D. R. Southard says, repurchase the farm. This, also, Southard denied. It does not appear, from any proofs, what further negotiations if any took place between the parties but

the result was, that, on the payment by Southard of one hundred dollars, Russell wrote and signed the following receipt on the back of the written memorandum, which he surrendered to Southard:

"Received, 6th Oct., 1830, of James Southard, by the hand of Daniel Southard, one hundred dollars, which makes the two debts of Brown and Johnston, with the $2,000, amount to the sum of $4,929.81½; and nothing but the act of God shall prevent the relinquishment of dower of Mrs. Russell being deposited in the Clerk's office by the 1st of January next. This is in full of all demands upon J. Southard.

(Signed) Gilbert C. Russell." [Seal.]

A mortgagee in possession may take a release of the equity of redemption. Hicks *v.* Cook, 4 Dow, P. C. 6; Hicks *v.* Hicks et al. 2 Gill & Johns, 85. But such a transaction is to be scrutinized, to see whether any undue advantage has been taken of the mortgagor. Especially is this necessary when the mortgagee, in the inception and throughout the whole conduct of the business, has shown himself ready and skilful to take advantage of the necessities of the borrower. Strong language is used in some of the cases on this subject. It was declared by Lord Redesdale, in Webb *v.* Rorke, 2 Sch. & Lef. 673, that "courts view transactions of that sort between mortgagor and mortgagee with considerable jealousy, and will set aside sales of the equity of redemption, where, by the influence of his incumbrance, the mortgagee has purchased for less than others would have given." And Chancellor Kent, in Holdridge *v.* Gillespie, 2 Johns. Ch. R. 34, says, "the fairness and the value must distinctly appear." Wrixon *v.* Colter, 1 Ridg. 295; St. John *v.* Turner, 2 Vern. 418. But strong expressions, used with reference to the particular facts under consideration, however often repeated by subsequent writers, cannot safely be taken as fixing an abstract rule. We think that, inasmuch as the mortgagee in possession may exercise an undue influence over the mortgagor, especially, if the latter be in needy circumstances, the purchase by the former of the equity of redemption, is to be carefully scrutinized, when fraud is charged; and that only constructive fraud, or an unconscientious advantage which ought not to be retained, need be shown, to avoid such a purchase. But we are unwilling to lay down a rule which would be likely to prevent any prudent mortgagee in possession, however fair his intentions may be, from purchasing the property, by making the validity of the purchase depend on his ability afterwards to show that he paid for the property, all that any one would have been willing to give.

We do not deem it for the benefit of mortgagors that such a rule should exist.

In this case it is unnecessary to rely on such a rule. For by his own showing, in his answer, it is clear that Daniel R. Southard, as the agent of his brother, either paid no consideration whatever for the extinguishment of the equity, or at the utmost only one hundred dollars. We think nothing was paid for it; and that the surrender of this right, claimed by Russell and denied by Southard, was insisted on as a condition for the correction of an actual mistake, which Southard was justly obliged to correct, without any condition : and we do not hesitate to declare, that a release of this equity, obtained by the mortgagee in possession, under a denial by him of the existence of the right to redeem, for no consideration at all, or as a condition for the correction of a mistake which in equity he was bound to correct, the written defeasance having been purposely so prepared as apparently to cut off the right of redemption prior to the time when the equity was released, cannot stand in a court of equity.

Indeed, if it were not for Russell's subsequent acquiescence, of which we shall speak hereafter, the question would not admit of a moment's doubt. Though this acquiescence is not without effect upon the complainant's rights, as will presently be seen, yet we do not think, that under the special circumstances, it ought to operate as a bar, to prevent redemption. The absence of all valuable consideration for the surrender of the equity, and the circumstances of distress under which it was made, and which, so far as appears, continued to exist down to the filing of the bill, coupled with the conviction, which we think Russell mistakenly entertained, that his rights were probably destroyed, must prevent us from allowing the lapse of time to be a positive bar.

The inquiry then arises, on what terms is the redemption to be decreed.

An account of the rents and profits is ordinarily an incident to a decree for redemption against a mortgagee in possession. But it is not an inseparable incident. This right to an account may be extinguished by a release, or an accord and satisfaction, or it may be barred by such neglect of the mortgagor to assert his claim, as renders it unfair for him, to insist on an account extending over the whole period of possession, and unjust towards the mortgagee to order such an account. A mortgagee in possession is deemed by a court of equity a trustee; but there is no other than a constructive trust, raised by implication, for the purpose of a remedy, to prevent injustice ; Kane *v.* Bloodgood, 7 Johns. Ch .R. 111 ; and it would be contrary to the fundamental principles of equity, to imply a trust, the execution of

which might work injustice. And accordingly it will be found, that in such cases, courts of equity have refused to order accounts against *quasi* trustees.

Thus, in Downer *v.* Fortescue, 3 Atk. 130, Lord Hardwicke, speaking of the case of an heir in possession under a legal title, which he is obliged by a decree to surrender to one having an equitable title, says, the court will order an account from the time the title accrued, unless upon special circumstances; as " when there hath been any default, or laches, in the plaintiff, in not asserting his title sooner, but he has lain by, there the court has often thought fit to restrain it to the filing of the bill." So in Pettiward *v.* Prescott, 7 Ves. 541, a case of constructive trust, Sir William Grant restrained the account of the rents and profits to the time of filing the bill, on account of the lapse of nearly twenty years; and similar cases may be found referred to in Drummond *v.* The Duke of St. Albans, 5 Ves. 433, and note 3 to page 339; and in Roosevelt *v.* Post, 1 Ed. Ch. R. 579. Indeed in Acherly *v.* Roe, 5 Ves. 565, where there was a trust created of a term, for the purpose of raising a sum of money, and the *cestui que trust* had been long in possession without objection, Lord Chancellor Loughborough refused even to carry the account back to the filing of the bill, upon the special circumstances of that case. This court, in Green *v.* Biddle, 8 Wheat. 78, gave its sanction to the rule as laid down by Lord Hardwicke, and declared it to be fully supported by the authorities.

This bill was filed after the lapse of nineteen years and eight months from the time the loan became payable. James Southard, the original mortgagee, had then been dead many years. More than sixteen years had elapsed since the defeasance was surrendered; and though we are satisfied Russell was under great embarrassments, and though we are of opinion he himself believed his right to redeem was probably extinguished by the terms of the defeasance, and its surrender, yet his neglect to look into and assert his rights, must not be allowed to subject the defendants to the risk of injustice. The defendants, and James Southard, have treated the property as their own, and have improved its condition. There is no suggestion of waste in the bill. The value of the land has greatly appreciated, from the growth of the neighboring city; and though we think James Southard designed to take an unconscientious advantage of Russell, and that the defendant, D. R. Southard, obtained the surrender of the defeasance, under such circumstances as rendered it constructively fraudulent, yet neither of them appears to have concealed any facts from Russell, or to have done any thing to prevent him from exhibiting his real case to counsel. To such a case, the language of the Vice-Chancellor, in Bowes *v.* East London

W. W. Co. 3 Mad. 384, exactly applies. "The plaintiff ought
to have looked into his rights; and as by his negligence to ob-
tain information concerning them and to assert them, the lessees
may have been led to expenditure on the premises, the benefits
of which they will lose, I shall not direct an account beyond the
filing of the bill." To this extent his acquiescence must be taken
to have concluded his right, and we shall direct that the account
of the interest due upon the money loaned, and of the rents and
profits of the farm, commence at the date of the filing of the
bill.

We can perceive no ground for charging Southard with the
money received from the insurance company, on account of the
destruction of the house. He was in possession, claiming to be
the absolute owner of the farm and its appurtenances. He ob-
tained the policy to cover his interest, and paid the premium.
If there were any equities against him arising out of the receipt
of this money, they would be in favor of the underwriters, and
not of the mortgagor. Carpenter *v.* Providence Washington
Ins. Co. 16 Pet. 501.

It remains only to advert to the cases of the defendants, who
claim as purchasers under D. R. Southard. The questions
arising therein were not argued by counsel, and upon looking
into that part of the record, we find some of them not capable
of being fully settled upon the facts therein disclosed.

It was probably understood by counsel, that these questions
would remain for consideration, in the court below, if the case
should be remanded.

Samuel D. Tompkins claims to have been a purchaser for
valuable consideration of thirty acres of this land, and to have
received a deed of conveyance thereof, and paid a part of the
consideration-money without notice of Russell's title, and before
the institution of this suit. He also claims to have made per-
manent and valuable improvements on the land purchased by
him, but whether before or since the institution of this suit does
not appear. William H. Pope, as the executor and trustee of
his father, William Pope, claims that his father, in his lifetime,
purchased at a sale on four executions against Southard another
part of these lands, and that Southard omitted to redeem the
land by paying what was due on three of the executions, and a
suit is shown by the record to be pending in the Court of Ap-
peals of Kentucky, wherein Russell's right to redeem is in con-
testation.

Matilda Burks, the widow of James Burks, deceased, and
John Burks, one of the sons of James, and William L. Thomp-
son, as guardian of other children of James, and James Guthrie,
assignee of J. R. Trunstall, the husband of a daughter of James.

claim a lien on these lands by virtue of a mortgage thereof executed by Daniel R. Southard, and Southard insists that Guthrie has been paid; it is not ascertained whether the debts intended to be secured on these lands, are or are not, fully secured upon other lands of Daniel R. Southard, which are embraced in the same mortgage. In this posture of the cause, it is not practicable for the court to pass finally upon the rights of these parties; and the cause will therefore be remanded, without deciding upon the existence or extent of the right of either of them as a purchaser.

A decree is to be entered, reversing the decree of the court below, with costs, declaring that the conveyance from Russell, the complainant, to James Southard, was a mortgage, and that Russell is entitled to redeem the same, and remanding the cause to the Circuit Court, with directions to proceed therein in conformity with the opinion of this court and as the principles of equity shall require.

*Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Kentucky, and was argued by counsel. On consideration whereof, it is the opinion of this court that the conveyance by Gilbert C. Russell, the complainant, to James Southard, and dated the 24th day of September, 1827, as set out in the transcript of the record, was a mortgage, and that said Russell is entitled to redeem the same. Wherefore, it is now here ordered, adjudged and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, reversed, with costs, and that this cause be, and the same is hereby, remanded to the said Circuit Court for further proceedings to be had therein, in conformity to the opinion of this court and as to law and justice may appertain.

After the opinion of the court was pronounced, a motion was made on behalf of the appellees for a rehearing, and to remand the cause to the Circuit Court for further preparation and proof, upon the ground that new and material evidence had been discovered since the case was heard and decided in that court.

Sundry affidavits were filed, showing the nature of the evidence which was said to have been discovered.

The opinion of the court upon this motion was delivered by Mr. Chief Justice TANEY.

The decree of the Circuit Court, in this case, was reversed during the present term, and a decree entered in favor of the ap-

pellant. A motion is now made in behalf of Daniel R. Southard, one of the appellees, to set aside the decree in this court, and to remand the case to the Circuit Court for further preparation and proof, upon the ground that new and material evidence has been discovered since the case was heard and decided in that court. In support of this motion affidavits have been filed stating the evidence newly discovered, and that it was unknown to him when the case was heard in the court below.

It is very clear that affidavits of newly-discovered testimony cannot be received for such a purpose. This court must affirm or reverse upon the case as it appears in the record.' We cannot look out of it, for testimony to influence the judgment of this court sitting, as an appellate tribunal. And, according to the practice of the court of chancery from its earliest history to the present time, no paper not before the court below can be read on the hearing of an appeal. Eden *v.* Earl Bute, 1 Bro. Par. Cas. 465; 3 Bro. Par. Cas. 546; Studwell *v.* Palmer, 5 Paige, 166.

Indeed, if the established chancery practice had been otherwise, the act of Congress of March 3d, 1803, expressly prohibits the introduction of new evidence, in this court, on the hearing of an appeal from a circuit court, except in admiralty and prize causes.

The motion is therefore overruled.