CRIMP et al. v. McCORMICK CONST. CO. et al.[1]

(Circuit Court of Appeals, Seventh Circuit. January 6, 1896.)

No. 251.

CONTRACTS—CONDITIONAL SALE OF STOCK.

The M. Co., which held a contract for the construction of a public work, and M., its president, entered into an agreement with one C., by which it was provided that in consideration of $25,200, paid to the M. Co. by C., there should be assigned and issued to him 126 shares of the stock of the M. Co., then owned by M.; that C. should be elected a director and vice president of the M. Co., and should personally assist in managing its affairs; that C. should be entitled to 50 per cent. of the net profit derived from the construction contract, which was guarantied by the M. Co. and M. to amount to $25,000, not including the $25,200 "invested in the stock," which should be returned to C. before any division of profits, and upon receipt of which C. should reconvey the stock to M. It was then provided that, as security for the guaranty of $25,000 profit, there should be delivered and assigned to C. 99 shares of stock of the M. Co. owned by M., to be held as collateral to the undertaking and security for the guaranty of profits; that the construction contract should be delivered, but not assigned, to C., to be held, in connection with the stock,

1 Rehearing pending.

for the guaranty and as security for any other sums C. might advance, with the intention of permitting C. to control the contract in case of the failure of the other parties to carry out the contract with him. Finally, it was provided that, in the case of failure of the M. Co. and M. to perform their agreement, the 99 shares of stock should become the property of C. as liquidated damages, and that, upon full performance of all the stipulations, all the stock issued to C. and held by him in his own name or as collateral should be reassigned and returned to M., and the construction contract returned to the M. Co., and the agreement be at an end, but that all the increment and betterment of the assets of the M. Co. and all additions thereto, made after the date of the agreement, should be the joint and equal property of the parties. *Held*, that such contract effected a conditional sale to C. of the 126 shares of stock first mentioned, for the price of $25,200, to be resold by him, for the same price, at the termination of the agreement, and not a loan by C. of $25,-200, upon the security of the stock; and that, upon the insolvency of the M. Co., C. was not entitled to share in the distribution of its assets as a creditor.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

This appeal depends upon the construction of a contract made July 24, 1892, between the McCormick Construction Company and R. P. McCormick, described together as the party of the first part, and W. G. Crimp, the second party. Broadly stated, the question is whether, by force of that contract, Crimp became an outright purchaser of stock, or only a creditor of the company, taking the stock as collateral. Soon after the making of the contract, Crimp became sick, and, in December following, died; and his widow, the appellant, having been appointed executrix of his last will, brought in the court below a bill upon which she procured the appointment of a receiver and other proceedings, whereby the property of the company and its contract with the drainage district were sold, the sum of $8,000 being obtained for the property, and $33,000 for the contract. In respect to the distribution ordered of the $8,000 there is no dispute. Of the amount received for the contract, the net sum of $27,228.29 remained, of which distribution was ordered among intervening creditors to the exclusion of the appellant, whose intestate was held to have been a purchaser of stock to the amount of $25,200 advanced under the contract, and not a creditor. That contract is of the tenor following:

"Whereas, the McCormick Construction Company, a corporation organized and existing under the laws of the state of Missouri, is the owner of a certain contract for excavating 6,000 lineal feet, known as section number fourteen (14) of the main drainage channel of the Chicago drainage ditch, said contract having been entered into between the said McCormick Construction Company and the sanitary district of Chicago, under date of July 12th, 1892, and by the terms of said contract it is provided that the said McCormick Construction Company shall excavate on said main drainage channel about 1,000,000 yards of solid rock, at and for the price of seventy-three (73) cents per yard, about 210,000 yards of glacial drift, at and for the price of twenty (20) cents per yard, and erect and build about 19,946 yards of rock wall, at and for the price of two ($2) dollars per yard, for other and more specific details of which said work and the terms of said contract reference is had to the same; and whereas, said McCormick Construction Company has now, in pursuance of said contract, erected on said section number fourteen (14) a large amount of machinery, engines, boilers, inclines, cables, tracks, siding, cars, buildings, etc., and is engaged in excavating and building said main drainage channel under the superintendence and direction of its president and general manager, R. P. McCormick; and whereas, said R. P. McCormick is the owner of 225 shares of the capital stock of said McCormick Construction Company; and whereas, W. G. Crimp, of 4445 Champlain avenue, Chicago, is desirous of becoming interested in the said McCormick Construction Company, on the terms, conditions, and stipulations as hereinafter provided:

Now, it is agreed between said McCormick Construction Company and R. P. McCormick, individually, hereafter called the party of the first part, and W. G. Crimp, hereafter called the party of the second part, as follows, to wit:

"First. That in consideration of the sum of twenty-five thousand two hundred dollars ($25,200) cash, paid to said McCormick Construction Company by said second party, there shall be at once assigned and issued to said second party one hundred and twenty-six (126) shares of the capital stock of the said McCormick Construction Company, now owned by R. P. McCormick, the par value thereof being two hundred dollars ($200) per share, full paid and nonassessable.

"Second. That said second party shall be at once elected a director and vice president of said company, and shall enter and personally assist in operating and managing said company and its business and affairs, without salary, and may furnish a suitable representative in the office of said company as assistant in its management, and at the expense of said company, as he may elect; such expense not to exceed the sum of one hundred dollars per month.

"Third. That the personal expenses or outlays of the officers of said construction company shall be charged to such officers personally. The officers of said company shall receive no salary, but the said R. P. McCormick shall devote his entire time to and manage and personally direct the construction of said drainage channel, during the life of said contract, without charge other than the share of profit that shall accrue to him hereunder and as a shareholder in said construction company.

"Fourth. That said second party shall be entitled to fifty per cent. of the net profit accruing to, and to be derived by, said construction company on account of said work now being done, or to be done, under its said contract with said sanitary district; and the first party hereto hereby agrees and guaranties that the amount of such profit to become due and payable to said second party shall not be less than twenty-five thousand dollars ($25,000), not including the sum of twenty-five thousand two hundred dollars ($25,200) invested in the stock of said company under this agreement, which said latter sum shall be returned to said second party prior to and before any division and distribution of the profits arising to said construction company, under said construction agreement, shall be made, on receipt by said second party, of which share of the profit and the money advanced and to be advanced by said second party second party shall reconvey to said McCormick two hundred and twenty-five (225) shares of the capital stock of said construction company herein mentioned.

"Fifth. That as security for the guaranty of said twenty-five thousand dollars ($25,000) profit, in addition to the principal sum of twenty-five thousand two hundred dollars ($25,200) paid by said second party to said construction company under this agreement, there shall be delivered and assigned to said second party ninety-nine shares of the stock of said construction company, of the par value of nineteen thousand eight hundred dollars ($19,800) owned by the said R. P. McCormick, which shall be held as collateral to this undertaking, and as security for the guaranty of profits herein made by the first party.

"Sixth. That there shall also be delivered, but not assigned, to said second party, the original contract existing between said construction company and the sanitary district of Chicago, to be held by said second party in connection with the stock of said construction company hereby agreed to be transferred and issued to said Crimp for the guaranty herein made, and as security for any sums or sum other than above mentioned that he may advance to said construction company; it being intended that said Crimp, through his ownership and control of all said stock hereby provided to be transferred to him, shall control the said contract in the event of failure by first party to carry out this contract or breach of this contract by the first party. And it is further agreed that said contract shall not, nor shall any right, title, or interest therein, be at any time assigned by any of the persons signing this contract. The said contract always to remain the property of said construction company, subject to the rights of said second party hereunder.

"Seventh. That the said sum of twenty-five thousand two hundred dollars

($25,200) to be now advanced by said second party shall be used by the first party in the payment and liquidation of the debts and liabilities of the Mc-Cormick Construction Company, as set out in the sworn schedule of assets and liabilities hereto attached, and made a part hereof, except as hereto otherwise provided.

"Eighth. That said second party shall advance to said construction company the further sum of seven thousand dollars ($7,000) to pay the item of that amount set out in the schedule to become due the Northwestern National Bank. That, when said indebtedness is paid by said second party, there shall be delivered to him seven promissory notes, executed by said construction company, each for the sum of one thousand dollars ($1,000), and payable at intervals of forty (40) days from the date of the advance of the said sum of seven thousand dollars ($7,000) by said second party; the said notes to bear interest at the rate of seven (7) per cent. per annum from date.

"Ninth. That the ninety-nine (99) shares of stock in said construction company to be assigned to said second party under paragraph fifth hereof and said contract mentioned in paragraph six hereof shall also stand and be held by said second party in like manner as security for the payment of the promissory notes of said construction company covering the advance of the seven thousand dollars ($7,000) aforesaid.

"Tenth. That in case of the failure of the first party to carry out and faithfully perform all the agreements and undertakings hereunder, that the said ninety-nine (99) shares of stock of said construction company mentioned in paragraph fifth hereof, immediately upon such failure, become the property of said second party, as and for liquidated damages hereunder.

"Eleventh. That on the completion of the work provided for in said contract, and the receipt of said construction company of payment for the same, and in case of the faithful performance of this agreement and of all the undertakings hereunder by the first party hereto, and the repayment to said second party of the sum of twenty-five thousand two hundred dollars ($25,200), the amount originally advanced hereunder, and of the additional sum of one-half the profits, but not less than twenty-five thousand dollars ($25,000), as provided in said guaranty, and of the said sum of seven thousand dollars ($7,000) and interest, as herein provided, then there shall be reassigned and returned to said R. P. McCormick all of the shares of said stock of said construction company hereinbefore provided to be issued to said second party, and held by said second party in his own name, or held by him as collateral; and said contract shall in such case be returned to said company, and thereupon this contract shall be ended.

"Twelfth. That, at the completion, termination, and fulfillment of this agreement in all its terms and conditions, all the shares of stock above mentioned, either held by said second party in his own name or as security for said guaranty, shall be transferred to said McCormick; but all of the increment and betterment of the assets of said company, and all additions thereto made, subsequent to the date of this agreement, shall be the joint and equal property of the parties hereto, to be disposed of as they may agree.

"This contract is signed in duplicate by the parties hereto, this 24th day of July, A. D. 1893.                                McCormick Construction Company,
                                                "By R. P. McCormick, Pres.
                                        "R. P. McCormick.
                                        "W. G. Crimp."

Schedules attached to the contract showed total assets $70,028, total liabilities $27,956, or net assets $42,072.

A few days later the following agreement was made:

"There being nothing expressed in the foregoing and attached contract, dated July 24th, 1893, and signed by R. P. McCormick and W. G. Crimp, expressing clearly upon what date accounts pertaining to the business covered by said contract shall commence and continue, other than as set forth in the statement of assets and liabilities made a part of said contract, we hereby mutually agree on this tenth day of August, 1893, that the party of the first part pay all labor accounts to and including July 20th, 1893, and receive credit for the proportion of the estimate for July, to and including July 20, 1893, less the reservation of 12½ per cent., which reservation is

named as a part of the assets in the foregoing contract, as signed by R. P. McCormick and W. G. Crimp, and dated July 24, 1893, as above described.

"R. P. McCormick.    [Seal:]
"W. G. Crimp.    [Seal.]"

It was admitted before the master, as shown by his report, that Crimp was elected a director and vice president of the construction company, and that he did enter and personally assist, for a time at least, in operating and managing said company and its business and affairs, as provided in the second clause of said contract; that the drainage contract referred to in the foregoing contract contained a provision which prohibited the original contractor from assigning it or subletting the work under penalty of forfeiture; and that there were no net profits. "It was neither admitted nor denied by counsel for the objecting creditors that said Crimp had paid the sums claimed or any sums under the said contract, but that question was left open for future determination if it should become material."

John N. Jewett and R. N. Baylies, for appellant Eugenia Crimp.

Wm. J. English, for appellant Ingersoll-Sergeant Drill Company.

W. E. Church, Frank S. Weigley, Chas. M. Sturges, Loren C. Collins, Adams A. Goodrich, Clarence S. Darrow, Wm. A. Vincent, John H. Hamline, Frank H. Scott, and Frank E. Lord, for appellees.

Before WOODS, JENKINS, and SHOWALTER, Circuit Judges.

WOODS, Circuit Judge, after making the foregoing statement, delivered the opinion of the court.

The contention of the appellant is that her intestate loaned to the McCormick Construction Company the sum of $25,200, mentioned in the first article of the contract of July 24, 1893, and that the 126 shares of capital stock of the company mentioned in that article, the 99 shares mentioned in the fourth article and the drainage contract referred to in the fifth article were delivered to him in pledge to secure the repayment of the loan. If it can be assumed or deduced that a loan was intended, it follows, of course, that the 126 shares of stock mentioned in the first article of the agreement, and perhaps the 99 shares mentioned in the fifth article, became a pledge or security for the repayment of the loan; but can that be said to have been intended, or to be the necessary result, in respect to the drainage contract? The fourth article of the agreement contains a guaranty that Crimp's share of profits shall not be less than $25,000, "not including" the sum of $25,200 invested in the stock of the company, which latter sum, it is provided, shall be returned to him before any division of profits shall be made. The fifth article provides that as security for the guaranty of $25,000 profit, "in addition to the principal sum" of $25,200, there shall be delivered and assigned to the second party 99 shares of stock, "which shall be held as collateral to this undertaking, and as security for the guaranty of profits herein made by the first party." "This undertaking," we suppose, means the entire contract, and includes all obligations thereby imposed upon the construction company and McCormick, or either of them. The sixth article has special reference to the drainage contract, which, it is stipulated, shall be delivered, but not assigned, to Crimp, to be held in connection with the stock agreed to be transferred to him "for the guaranty herein made, and as security

for any sums or sum other than above mentioned that he may advance to said construction company"; it being intended that, through his ownership and control of all the stock to be transferred to him, he shall control the said contract in the event of failure by the first party to perform the agreement. It is further stipulated that said contract shall not be assigned by any of the parties to the agreement, but shall always "remain the property of said construction company, subject to the rights of said second party hereunder." We incline to the view that it was not intended by this provision to make a pledge of the drainage contract for the performance of any obligation, and that the effect was simply to give to Crimp the possession and such control as to enable him to prevent any disposition of the instrument which might depreciate the stock, in which the security intended to be given him should consist. The last clause, "subject to the rights of said second party," does not expand to the dimensions of a pledge the right of mere physical possession which was made attendant upon the possession of the stock, which alone it was intended to pledge.

But, if it be conceded that there was a pledge of the drainage contract, the next inquiry is, to secure the performance of what act or obligation was the pledge intended? The language used is: "To be held, * * * in connection with the stock * * * transferred * * * for the guaranty herein made, and as security for any sums or sum other than above mentioned." This seems to have been regarded by counsel on both sides as meaning that the stock referred to was pledged, not only "as security for the guaranty" of profit, according to the fifth article, but also as security for other sums, besides those before mentioned, which Crimp might advance, but grammatically it seems rather to mean that the contract is to be the security for the additional sums contemplated. The substance of the expression is that the contract is to be held in connection with the stock, and as security for sums advanced other than those before mentioned. Upon this construction the contract was a security for the sum of $2,983.34, alleged to have been advanced by Crimp over and above the stipulated sum of $25,200; but, as no objection is urged here against the decree in that particular, the matter is important only as it bears upon the construction of the agreement in respect to matters in dispute.

If next it be conceded that the contract was pledged for all that the stock, in connection with which the contract was "to be held," was pledged, what is embraced in the security? By force of the fifth article of the agreement the 99 shares of stock are to be assigned as security for the guaranty of a profit not less than $25,000, "in addition to," or, as it is expressed in the fourth article, "not including," the original sum of $25,200, which Crimp agreed to invest, and which it was agreed should be returned to him before there should be any distribution of profits. That guaranty does not in terms nor by necessary implication embrace the agreement that the original loan or investment should be returned. The agreement is not, though it was probably the understanding or expectation, that

that return should be made out of the profits of the drainage contract. It might be made out of other assets of the construction company if the scheme had been prosecuted with success. The construction company and McCormick, if the transaction was a loan, assumed two distinct obligations: First, to repay the debt; and, second, if the contract in that respect is binding upon the corporation, to make good to Crimp the stipulated profit. But the guaranty for which the 99 shares of stock were pledged, and for which the drainage contract is assumed to have been pledged, extends only to the latter obligation. The entire investment or loan is to be returned, it is true, before the counting of profits begins; but it does not follow that the guaranty that the profits shall not fall below a stated amount includes or is equivalent to a guaranty of the loan. It means no more than that earnings or receipts, which otherwise might be counted as profits, shall be first used, if necessary after exhausting other resources, to repay the investment; and, whether there be enough or more or less than enough for that purpose, the guaranty is confined to the profits, and does not include the whole or any part of the investment. But the appellant has made no claim for profits; and as the 126 shares of stock, which, upon the theory of a loan, were pledged for repayment of the money, are worthless, the appellant's position, on this theory, was that of an unsecured creditor, entitled to share ratably with other creditors of the construction company in the proceeds of the sale of the drainage contract.

But we do not think that the theory of a loan is tenable. We are of opinion, on the contrary, that upon the face of the agreement, unaided by extraneous evidence, the advancement which Crimp undertook to make must be regarded as the price of 126 shares of stock purchased. The purchase was a conditional one; that is to say, it was upon an agreement to resell to the vendor, who bound himself to repurchase, at the original price, provided the other parts of the agreement were duly performed. When the question is whether a transaction was a conditional sale or a mortgage, the courts, in doubtful cases, lean to the conclusion that the reality was a mortgage, and not a sale. Russell v. Southard, 12 How. 139. When extraneous evidence is heard, the controlling inquiry is whether or not there was a debt, pre-existing or then created, for which the conveyance or transfer was intended to be a security. When, as here, the question is to be determined by the face of a writing, the rule has been declared that "where all the clauses of an instrument are consistent with a conditional sale, but some inconsistent with a mortgage, it will be construed as being the former, and not the latter." 1 Hil. Mortg. 100, note a; Chapman v. Turner, 1 Call, 251. Without repeating or going into a further analysis of the terms of this agreement, we think the clear intention of the parties was a sale of the 126 shares of stock. Article 1, by itself, can mean nothing else; and the other provisions and expressions of the agreement not only support that conclusion, but, in some respects, are irreconcilable with the theory of a loan; especially the provision of

the twelfth article that after fulfillment of the agreement in all its terms and conditions, and a retransfer of all of the stock to McCormick, "all of the increment and betterment of the assets of said company, and all additions thereto, made subsequent to the date of this agreement, shall be the joint and equal property of the parties hereto, to be disposed of as they may agree." Money advanced as the price of shares of stock in a company upon an agreement that it shall be returned and the stock reassigned might be regarded as a loan, perhaps, notwithstanding stipulations that the lender should be made president, and be guarantied large profits,—in lieu of interest, it might be, and of compensation for services; but such a right as this to share in the increment and betterments of the corporate property cannot pertain to a loan, and is consistent only with the theory that Crimp intended, as in explicit terms he agreed, to become a shareholder. Upon this point the tenth article of the agreement is of great significance and perhaps is controlling. It provides that, in case of the failure of the first party to perform the agreement in all its parts, the 99 shares of stock shall immediately upon such failure become the property of the second party, as and for liquidated damages. No other remedy seems to have been contemplated, and in such case—such is the present case—perhaps no other can be invoked. To say the least, if that remedy were asserted, the absolute ownership of the 225 shares of stock would become vested in the appellant as the representative of the second party, and the right of the company to retake possession of the drainage contract, which could not be included in the forfeiture, would immediately revive.

The decree below is therefore affirmed.