### North Chicago St. R. R. Co. v. Le Grand Co.

1. TENDER—*What is Not a Ground for Objection.*—It is not a good ground for objection to a tender that it is too much, or because it does not amount to the debt due, together with another debt which the party to whom the tender is made insists on receiving at the same time.

2. SAME—*Of Rent, to Prevent a Forfeiture of the Lease.*—A tender of rent due, if refused, is as effectual to prevent a forfeiture for the non-payment of rent as is the actual payment of the rent due.

3. LEASE—*Duty of an Assignee in Possession.*—Where the assignee of a lease, by way of mortgage as security for an indebtedness overdue, takes possession of the demised premises, and his duty is to exercise such care and diligence in respect to the property as a provident owner would exercise.

4. SAME—*Private Sale by an Assignee in Possession, When Fraudulent.*—The assignee of a lease by way of mortgage for the security of overdue indebtedness has no right to sell the term at private sale, and a purchaser at such sale with knowledge of the fact participates in the fraud, and by taking possession of the demised premises, claiming to own them, and appropriating them to his own use, he becomes chargeable as a mortgagee wrongfully in possession.

5. SAME—*Right of Renewal Not Assignable.*—The only estate which a lessee can assign is the term created by the original lease. The right of renewal of a term is not an estate.

6. CHANCERY PRACTICE—*Duty of the Master Under Special Orders of Reference.*—Where a cause is referred to a master in chancery to take an account of and concerning the premises and report his findings to the court with all convenient speed, it is the duty of the master merely to report his findings. He is not required to make an argument, state the reasons for his findings, or describe the mental process by which he arrived at them.

7. ENGLISH DECISIONS—*When Not to be Followed in this State.*—A decision by an English court which is regarded by the English bench and bar so unreasonable as to warrant a resort to legislation to eliminate it from the body of the English law, will hardly be followed in this State.

8. DAMAGES—*Measure of, in a Breach of a Contract to Execute a Lease.*—The measure of damages in an action at law for a breach of a contract to execute a lease is the difference between the rent to be paid and the actual rental value of the premises at the time of the breach.

**Bill for Relief.**—Appeal from the Circuit Court of Cook County; the Hon. MURRAY F. TULEY, Judge, presiding. Heard in this court at the October term, 1900. Affirmed on a remittitur being entered as directed, otherwise reversed and remanded. Opinion filed May 23, 1901. Remittitur entered and decree affirmed June 28, 1901.

**Statement.**—July 7, 1886, the Le Grand Company, appellee, filed a bill against the North Chicago Street Railroad Company (hereafter called the railroad company), appellant, the North Chicago City Railway Company (hereinafter called the railway company), and Adam L. Amberg, claim-

ing, in view of facts alleged in the bill, that Amberg was a mortgagee in possession of a certain leasehold interest in land; that there was a fraudulent combination or confederacy between him and the other defendants, or one of them, to deprive complainant of its rights in the premises, and praying, among other things, for an accounting, and that Amberg and said railroad or railway company be ordered to pay to complainant such money as might be due to it, and that complainant be permitted to redeem, etc., and for general relief.   Subsequently, the bill was amended and engrossed as amended.   The defendants answered, replications were filed to the answers, and evidence on the issues thus made was produced and heard by the chancellor in open court, from which evidence it appears as follows: August 12, 1884, the railway company demised to George M. Irwin, by written demise of said date, lots 1 to 13, inclusive, and the north ten feet of lot 14 in block 18 in Bushnell's addition to Chicago, to have, etc., from October 1, 1884, till September 30, 1889, the lessee to pay as rent for said premises $23,000 per annum, $3,000 payable the first year and $5,000 payable each succeeding year, payments to be made quarterly in advance, the lessees also to pay all water rates and taxes that might be laid or charged against the premises during the existence of the lease, failing in which, the lessor might pay them; in which latter case the payments were to be taken as additional rent, to be collected in the same manner as other rent.   The lease contains covenants that the lessee will, before January 1, 1885, place on the demised premises permanent improvements, to be approved by the lessor, costing not less than $12,000, which, on the termination of the lease in any way, are to belong to the lessor; not to underlet or assign any part of the premises without the written assent of the lessor; that if the rent or any part thereof shall be unpaid when due and for ninety days thereafter, the lessor may declare the term ended and re-enter; waiver of notice of election to declare the term ended, and of demand for rent; agreement of lessee not to remove any buildings or other improve-

ments from the premises, or alter the same without written assent of the lessor; provision that no part of the premises shall be used or suffered to be used for the manufacture or sale of liquor; power of attorney to confess judgment in forcible detainer; that after service of notice, or commencement of suit, or final judgment, the receipt by lessor of rent due shall not be a waiver of notice, suit or judgment. The lease also contains the following:

"It is further covenanted and agreed that said party of the second part shall be entitled to a renewal of this lease for a further term of five years from October 1, 1889, at an annual rental equal to six per centum of the value of said land, exclusive of improvements thereon, to be determined by a majority of three disinterested persons as appraisers, (one of whom shall be chosen by said party of the first part, one by said party of the second part, and the third by the two so chosen) payable quarterly in advance, and also all taxes and installments of the Lincoln Park assessment, which may be assessed or payable during said term, and upon the same terms and conditions in other respects as are contained herein, except this renewal clause; provided, he shall, at least ninety (90) days prior to the expiration of the term covered by this lease, notify said party of the first part, in writing, of his election so to renew the same, and shall not at the time of such notice, or thereafter, during the continuance of this lease, be in default under any of the covenants or agreements herein contained."

September 30, 1894, George M. Irwin, the lessee, assigned the lease to the Le Grand Roller Skating Rink Co., now the Le Grand Co., appellee. The assignment and written assent thereto are as follows:

"Assignment of foregoing lease by George M. Irwin to Le Grand Roller Skating Rink Company, dated September 30, 1884, as follows:

"KNOW ALL MEN BY THESE PRESENTS, that I, George M. Irwin, for and in consideration of one (1) dollar and other good and valuable consideration to me paid by Le Grand Roller Skating Rink Company, a corporation existing under and by virtue of the laws of the State of Illinois, do by these presents, grant, convey, assign, transfer and set over unto the said Le Grand Roller Skating Rink Company, the

certain indenture of lease made and bearing date August 12, 1884, executed by the North Chicago City Railway Company to me for a term of years, of lots one (1) to thirteen (13), both inclusive, and the north ten (10) feet of lot fourteen (14), all in block eighteen (18), in Bushnell's addition to Chicago.

" That this assignment shall take effect on the thirtieth day of September, A. D. 1884, to continue during the residue and remainder of said term, subject to the rents, covenants and conditions of said lease, and the said Le Grand Roller Skating Rink Company hereby accepts said assignment and agrees, in consideration thereof, to hold the said George M. Irwin harmless, and for all damages which may arise by reason of his having been lessee of said premises under said lease.

" Witness the hand and seal of the said George M. Irwin and the signature of the said Le Grand Roller Skating Rink Company, and its corporate seal duly attested, this 30th day of September, A. D. 1884.

George M. Irwin."

" The North Chicago City Railway Company, lessor of the lease mentioned in said assignment, hereby consents to said assignment and releases the said George M. Irwin from said lease, accepting the said Le Grand Roller Skating Rink Company as a substitute.

" In witness whereof the said North Chicago City Railway Company has caused this instrument to be signed by its president, and its corporate seal to be affixed, and attested by its secretary, the said 30th day of September, A. D. 1884.

" North Chicago City Railway Company,

[Seal.]                    by W. C. Turner, President."

January 21, 1886, the Le Grand Company assigned the lease to Adam L. Amberg, defendant to the bill.   The written assent of the North Chicago City Railway Co. to the assignment is as follows:

" Permission is hereby given to the Le Grand Company to assign the within lease to Adam L. Amberg, and further permission is given to said Le Grand Company, or its said assigns, to sublet said premises for a summer garden, or other purposes not calculated to injure the reputation of said property; but the Le Grand Company is not released from the payment of rent or the performance of any other covenant in said lease, and no incumbrance shall be made to

affect the rights of the lessor." Attestation clause; signature, " North Chicago City Railway Company, by V. C. Turner, Pres.," and seal attached by " Hiram Crawford, Secretary."

At the time the assignment to Amberg was made, the Le Grand Company borrowed of him the sum of $10,000, for which it gave a judgment note, and, to secure payment of the same, executed to Amberg a chattel mortgage of property situated on the demised premises and assigned the lease to him. The assignment of the lease to Amberg is absolute in form, and whether the defendant companies knew that it was merely as collateral security, is a question in respect to which there is a conflict in the evidence.

May 3, 1886, the loan from Amberg to the complainant remaining wholly unpaid, he caused judgment by confession to be entered on the note for the sum of $10,447.04. Whether execution issued on the judgment, does not appear from the evidence. Also, May 3, 1886, Amberg caused the chattel mortgage to be foreclosed, by entry on the premises, taking possession of the mortgaged property and selling the same. The return of one Burke, Amberg's agent in the matter, is, in substance, that May 3, 1886, at twelve o'clock noon of said day, he, by authority of Amberg, took possession of the premises and of the property described in the mortgage, advertised the property for sale at ten o'clock May 5, 1886, as required by the mortgage, and that the property was purchased by Amberg for the sum of $700, which sum, less the expense of foreclosure, amounting to $195, he credited on the mortgage debt. Amberg testified that May 5, 1886, he tendered to Mr. Yerkes, who was then president of the lessor, the sum of, he thinks, $1,500, which Mr. Yerkes refused to accept. Amberg at first testified that the tender was after the entry of the judgment by confession in forcible detainer, hereafter mentioned, but his attention having been called to a bill sworn to by him and filed May 7, 1886, he said the tender was before the entry of that judgment. Yerkes admitted that Amberg made him a tender in bank notes, which he refused because the sum tendered did not amount to the rent and taxes. The railway

company had paid the taxes of 1885, due May 1, 1886. May 5, 1886, there was due and unpaid to the railway company a balance of $100 of the quarterly rent due in advance January 1, 1886, but no taxes in respect of which there could then be a forfeiture, and that company, May 5, 1886, caused judgment to be confessed in forcible detainer, by virtue of the power of attorney contained in the lease, and sued out a writ of restitution on the judgment, which was delivered to the sheriff at 3:40 o'clock in the afternoon of said day. The sheriff's return to the writ is, in substance, that he executed it by delivering possession of the premises to the plaintiff in the writ.

It appears from the evidence that the railway company and Amberg were each in possession of a part of the premises, and that the former subsequently abandoned possession, and Amberg, in his sworn bill, filed May 7, 1886, put in evidence by the defendant companies, alleges that when the writ of restitution issued he was in possession of the premises. Charles T. Yerkes became president and a director of the railway company March 24, 1886, and became president of the railroad company May 24, 1886, and continued to be the president of each company from said dates, respectively, till the hearing of the cause. All the officers of the former company and all the directors of that company, except one director, became officers and directors of the latter on its organization in May, 1886. After the filing of the bill by Amberg against the North Chicago City Railway Company and others, May 7, 1886, and the issuing of an injunction as prayed by the bill, Mr. Yerkes was told by Mr. Moore, his attorney, that Amberg was in possession of the property, and that he, Amberg, was the man Mr. Yerkes would have to deal with; after which, Mr. Yerkes had a talk with Amberg and told him that he, Yerkes, was willing to have the thing run on as it was, except that there should be a thirty instead of a ninety days clause in the lease, in respect to default for rent. Mr. Yerkes also consulted Mr. Goudy about the matter, who told him it was all right; that Amberg could maintain his position, and that he, Yerkes, had better close up the matter with Amberg.

The arrangement with Amberg was made about May 12, 1886, which consisted solely, so far as appears from the evidence, of the statement made by Mr. Yerkes to Amberg, viz., that he, Yerkes, was willing to have the thing run on as it was, except the change from ninety to thirty days in respect to default in payment of rent. There was no new agreement in writing, nor was there any written change of the assigned lease. Amberg was in possession of the premises when the arrangement with him was made. May 12, 1886, the railway company gave to Amberg the following receipt for moneys paid by him to the company:

" CHICAGO. May 12, 1886.

Received of Adam L. Amberg one hundred dollars ($100) for balance of rent due on quarter ending March 31, 1886, twelve hundred and fifty dollars ($1,250) in full for quarter beginning April 1, 1886; ten hundred forty-seven and 06-100 dollars ($1,047.06) for taxes paid out by North Chicago City Railway Co. on property mentioned in lease dated Aug. 12, '84.

NORTH CHICAGO CITY RAILWAY COMPANY,
By Wm. H. & J. H. Moore,
Atts. for Co."

On the same day the bill filed by Amberg against the railway company was, by stipulation between the parties, dismissed, and Amberg executed to the railroad company the following release:

" In consideration of the agreement this day executed between the North Chicago City Railway Company and Adam L. Amberg, and other valuable considerations this day received by said Amberg, said Amberg hereby releases said railway company from any and all claims for damages, or choses in action of every nature or description which said Amberg has or may have against said railway company, by reason of said company taking possession of the premises mentioned in said agreement by force or otherwise, and for any and all claims for damages of every name, nature or description against said company, or the sheriff of Cook county, Illinois, or his deputies.

ADAM L. AMBERG.   [SEAL.]

May 12, 1886."

The North Chicago Street Railroad Company became

North Chicago St. R. R. Co. v. Le Grand Co.

incorporated and organized May 19, 1886, and May 24, 1886, an agreement was executed between the railway and railroad companies, by which the railway company, in consideration of certain agreements of the railroad company, transferred to the latter company the railway company's entire property, including its tracks, rolling stock, etc., to be used and operated by the railroad company, the agreement to continue in force for the term of 999 years.

June 28, 1886, the following agreement between the railroad company and Adam L. Amberg was executed :

" This agreement made and entered into this 28th day of June, A. D. 1886, by and between Adam L. Amberg, of Chicago, Illinois, party of the first part, and the North Chicago Street Railroad Company, a corporation organized and existing under and by virtue of the laws of the State of Illinois, party of the second part, witnesseth : whereas, on the 12th day of August, A. D. 1884, the North Chicago City Railway Company demised and leased, by indenture in writing, to one George M. Irwin, the following described premises situate in the city of Chicago, county of Cook and State of Illinois, to wit :   Lots one (1) to thirteen (13) inclusive, and the north ten feet, front and rear, of lot fourteen (14) in block eighteen (18) in Bushnell's addition to Chicago, from the first day of October, 1884, for and during and until the thirtieth day of September, A. D. 1889, the said lease giving to the said Irwin the right to renew and extend the same for an additional five years from October 1, 1889, with the right on the part of said Irwin to purchase the demised premises upon certain conditions in said lease mentioned; and, whereas, said Irwin, on or about the thirtieth day of September, 1884, with the assent of the North Chicago City Railway Company, sold, assigned, transferred and set over to the Le Grand Roller Skating Rink Company the said lease, and all his rights thereunder; and whereas, also, the said Le Grand Company, on or about the 20th day of January, 1886, with the consent of the said North Chicago City Railway Company, sold, assigned, transferred and set over to Adam L. Amberg the said lease; and whereas, the said Amberg is now the owner of said lease, and all the property and improvements of every name and nature which have been placed in or upon said demised premises, by either the said Irwin, the Le Grand Roller Skating Rink Company, or the said Amberg, and has full

right and ample authority to sell and dispose of the same. Now, therefore, in consideration of the sum of seventeen thousand dollars to him paid by said second party, the receipt whereof is hereby acknowledged, the said party of the first part has sold, assigned, transferred and set over, and by these presents does sell, assign, transfer and set over to the said party of the second part, the said lease demising said premises to said Irwin, and has assigned and does hereby assign to said second party all the rights, covenants and obligations of every kind in said lease mentioned and contained, and has sold, assigned, transferred and set over, and by these presents does hereby sell, assign, transfer and set over to the said second party all the improvements, fixtures and property, of every kind and nature, put into or placed upon said premises by either said Irwin, said Le Grand Roller Skating Rink Company, or by the said first party; it being the intent of this instrument to sell to and invest in said second party the said lease and all the covenants and obligations of the same, and to sell and convey to said second party the said improvements and property now in and upon said premises. And, for the consideration aforesaid, the said first party hereby covenants and agrees with said second party that, at the time of the execution of these presents he is the sole and absolute owner of said lease and the said improvements and property; that they are free and clear of all liens and incumbrances created by him, and that he has good right and full power to assign said lease and sell and convey said property and improvements. And said party of the first part, for the consideration aforesaid, hereby covenants and agrees that May Garrity and Sallie Garrity will quit and deliver up possession of that part of said premises now occupied by them, on or before the 1st day of August, 1886, and he further covenants and agrees that, if any legal proceedings shall be required, or be necessary, to obtain possession of that part of said premises occupied by said Garritys, the said party of the first part will pay, satisfy and discharge the same, the said second party being fully authorized and empowered, in case said Garritys shall not on said first day of August vacate the said premises, to employ counsel to take such action in the premises as may, by its counsel, be advised in the premises. This agreement to be binding upon the successors, heirs and assigns of the respective parties. In witness whereof the said party of the first part has hereunto set his hand and seal, the day and year first above written.

(Signed)    Adam L. Amberg.    [Seal.]"

Indorsed on the agreement is the following:

"Received on the within twelve thousand dollars ($12,000.00), balance to be paid when full possession of premises is given, which is to be given on or before July 15th, 1886.

ADAM L. AMBERG.    [SEAL.]"

When the lessee, Irwin, took possession of the demised premises, there was on the premises only the walls and the remains of the roof of a building which had been used for car stables. The building had passed through the great Chicago fire of 1871, and the roof had fallen in and the walls were in bad condition.

The following stipulation was made by the parties on the hearing:

"It is stipulated that the dimensions of the premises in controversy are as follows: $339\frac{1}{3}$ feet on Clark street by 150 feet on Elm street; that the natatorium measures $46\frac{1}{3}$ feet on Clark street back to an alley, to a depth of 150 feet; that the storage warehouse is $85\frac{1}{2}$ feet front on Clark street, by a depth of 150 feet to an alley; that out of the storage warehouse and in the northeast corner thereof was taken an electric plant, which had the following dimensions: $38\frac{2}{3}$ feet by $33\frac{1}{2}$ feet, for a part of it, and the balance $46\frac{1}{4}$ feet by $28\frac{1}{2}$ feet."

Irwin, who was president and general manager of the Le Grand Company, testified that the improvements cost about $50,000, and that they were as good at the time he testified as when made. The evidence is that prior to January 1, 1885, the complainant expended more than $12,000 in improvements on the premises.

April 1, 1886, the Le Grand Company ceased to use the rink part of the premises as a roller skating rink, roller skating having gone out of fashion, and the business having become unprofitable. Irwin testified that, in order to make the rink part of the premises profitable, it was necessary to use it for other than roller skating purposes, which the Le Grand Company contemplated at the time Amberg took possession.

August 4, 1884, application was made for the charter of

the Le Grand Company, and the object of the corporation is thus stated in its articles of incorporation :

" The object for which it is formed is to provide buildings and other facilities for roller skating, and such other amusements as are incidental thereto, located in the city of Chicago, Illinois."

In addition to evidence of the foregoing facts, the court also heard evidence in open court of income derived by the Le Grand Company from the premises, the rental value of the premises, the uses to which they could be put, etc. May 22, 1888, the court entered a decree, finding the execution of the lease to Irwin; its assignment by Irwin to the complainant, the Le Grand Company; the making of valuable permanent improvements on the premises by the complainant, at a cost of $50,000; that the complainant had complied with the terms of the lease; that the lease remained in full force; that January 21, 1886, complainant, with the assent of the railway company, assigned the lease to Amberg, as collateral security for a loan of $10,000, evidenced by complainant's promissory note, payable in eight months from that date, interest on which loan, at the rate of eight per cent per annum, was paid by complainant for four months, in advance; that the railway company knew that the assignment to Amberg was made as a mortgage only; that May 3, 1886, Amberg entered into possession of the premises as mortgagee, excluded complainant therefrom, remained in such possession until June 28, 1886, and received therefrom a large amount of rents, profits, etc.; that Amberg took possession of all the movable property, under the chattel mortgage, and, by the sale of a part thereof, collected a large sum of money, which should be credited on the mortgage debt, and converted the remainder, the value of which should be so credited. The decree then sets out the agreement between the railroad and railway companies of date May 24, 1886, and finds that June 28, 1886, Amberg, being then in possession of the premises, assigned his mortgage to the railroad company for $17,000, the company then knowing that Amberg was merely a mortgagee; that com-

plainant was entitled to redeem, on the payment of the mortgage debt, and that, by virtue of said assignment, the railroad company became a mortgagee and took possession, leaving unimpaired complainant's equity of redemption; that, since June 28, 1886, said railroad company has been in possession, as such mortgagee, and in receipt of rents, issues and profits, and occupying a part of said premises for its own business, and is liable for the use of said premises, and for all of said premises said railroad company is liable to account for what it has received, or might have received, by the use of due diligence; that said mortgage has never been foreclosed, and said railroad company is in possession as mortgagee only; that May 5, 1886, said railway company, without authority of law, and for the purpose of depriving complainant of its leasehold, caused judgment in forcible detainer to be entered against complainant in the Superior Court of Cook County, which judgment is void for want of jurisdiction in said court, etc.; that after said judgment was entered, and May 12, 1886, it was abandoned by the parties thereto, and the said Amberg and said railroad company elected to treat and did treat the said lease as subsisting, and all its covenants as obligatory upon the complainant, and that May 3, 1886, said Amberg caused judgment by confession to be entered in said Superior Court, by virtue of a power of attorney attached to said note, for the mortgage debt, costs and attorney's fees, and for no other consideration, which judgment remains unsatisfied of record. The ordering part of the decree is, in substance, as follows :

The court doth order, adjudge and decree that said cause be referred to Walter Butler, Esq., one of the masters in chancery of this court, to take an accounting of and concerning the premises; that an accounting be had of the mortgage debt, interest, principal, disbursements by Amberg and by the street railroad company, taxes, assessments, water rates and rent on said lease, necessary repairs, and that complainant be charged therewith, and that the railroad company be credited therewith; and there be credited to the complainant and charged to the street railroad com-

pany all such rents, issues and profits as either it or said Amberg may have received while in possession of said premises respectively, or by proper exertion might have received, including a reasonable rent for the part of said premises occupied by them, or either of them, while so in possession, and also all moneys received by said Amberg on the sale of said movable property under the foreclosure sale thereof aforesaid, and also the value of said movable property, so by the said Amberg converted to his own use, which values and moneys, when ascertained by said master, together with said rents, issues and profits, are to be applied as far as necessary in the reduction of said mortgage debt, and other disbursements, and the surplus, if any, to be credited to said complainant. Interest to be allowed on the debits and credits from their several dates to the date of the master's report.

August 9, 1888, Master Butler filed his report, with objections thereto by the complainant, and also by the railroad and railway companies, which objections were ordered to stand as exceptions, and, October 17, 1888, the court set aside the report for the reasons, as stated in the order, that the case of the defendants had not been properly presented, and that the master, in taking and stating the account, had not followed the direction of the court; and the court referred the case to Waller, master, on the order therefor made, all material evidence theretofore taken to be considered by said master.

March 10, 1890, Waller, as special commissioner, filed his report, with objections thereto by the railroad and railway companies, and May 29, 1890, the court set aside the report, for the alleged reason that the commissioner had not followed the directions and the decree of the court, and referred to Boyesen, master, the said report and the account and the testimony taken by the said commissioner, as well as evidence taken by Butler, master, to examine and report, in accordance with the decree and directions, and to use any evidence or exhibits taken on any former hearing by the court, or by Butler or Waller, and base his report on

the foregoing, without receiving any new evidence. The order recites: "This order is made without objection thereto on part of the said defendants."

February 20, 1891, Boyesen, master, filed his report, with objections thereto by the complainant, and also by the railroad and railway companies, defendants, all of which had been overruled by him. The defendant companies filed exceptions, and the objections of complainant before the master were allowed to stand as exceptions; all of which exceptions the court overruled, and the report was confirmed October 1, 1891.

July 14, 1890, after the reference to Butler, the complainant, by leave of court, filed a supplemental bill. It is alleged in the bill, in substance, that Amberg died intestate (Amberg died January 13, 1890); that since the filing of the original bill, the five year term created by the lease expired. The bill then sets forth the covenants of the lease in respect to a renewal thereof, and avers that June 29, 1889, and more than ninety days before the expiration of the lease, complainant notified the railroad and railway companies, jointly and severally, that complainant elected to renew the lease, and had nominated Nelson Thomasson as appraiser (setting out the notice); that neither of said companies took any action with regard to the appointment of an appraiser; that said Thomasson also notified said companies of his appointment as appraiser by complainant, by leaving a notice of the same with one Meeker, the secretary of each of said companies (setting forth the notice); but each of said companies neglected and refused to appoint an appraiser. Then follows a special prayer for relief and the prayer for general relief.

The defendant companies answered jointly, denying the service of notice on them; denying that complainant was not in default, and averring that it was; admitting that they took no action in regard to the appointment of an appraiser; alleging the object of complainant's incorporation, and that it had ceased doing the business for which it was incorporated, and that its only object, in seeking a

renewal of the lease, is to sell the same, or rent the premises to third persons for purposes other than those specified in its charter. A replication was filed, and August 11, 1892, the court rendered a decree wherein, after reciting that the cause came on to be heard on the original and amended bill, the answers thereto, and replications, the supplemental bill and answer thereto, and replication, the confirmed report of Boyesen, master, and the testimony, the court finds that the railroad company, as mortgagee in possession, owes to complainant $20,919.20, above all offsets, none of which has been paid; that Irwin, with the consent of the railway company, assigned the lease to complainant, which assignment included all the covenants of the lease, and the railway company thereupon accepted complainant as its tenant, in lieu of said Irwin, and complainant thereby became entitled, as such tenant, to all the benefits of the covenants of the lease; and the said company released said Irwin from all liability on said covenants, and that September 30, 1889, the first term of five years, specified in said lease, expired by limitation. The covenant of the lease in respect to renewal is then set forth at large in the decree, and the court finds that complainant, in contemplation of a renewal, expended a sum exceeding $50,000 in making permanent and valuable improvements on the premises; that June 29, 1889, it notified the railroad and railway companies, jointly and severally, of its election to receive a renewal of the lease, and that it had nominated Nelson Thomasson as appraiser; that complainant was not and is not in default in respect to any of the covenants and agreements contained in the lease; that neither of the defendant companies acted in respect to the appointment of an appraiser; that the said notices given by complainant and its appointment of a receiver were authorized by the complainant's board of directors; that the appraiser appointed by complainant notified said companies of his appointment, etc., and requested them to inform him of their nomination of another appraiser, and that they, and each of them, neglected and refused to pay any attention to the request

of complainant and said appraiser; that September 30, 1889, said railroad company was mortgagee wrongfully in possession, having entered when there was no default, and having continued therein long after the payment of the mortgage debt, and having at all times denied the right of complainant, the mortgagor, and it was equitably required to hold said leasehold and the renewal thereof in trust for complainant; that the refusal of said railroad company to unite with complainant in appointing appraisers, was a fraud on complainant, and estops said company from claiming that its possession, since October 1, 1899, is not under a renewal lease; that since said last date said railroad company has been in possession of said premises as a naked trustee for complainant, and without right; that said mortgaged premises have been diverted from the use to which they were applied by complainant, and have been so radically changed as to destroy their value for such use, except the natatorium portion thereof; that expensive machinery has been placed therein by the railroad company, and has been, and still is, applied to the use of a cable station, in propelling a large portion of the cars used by said railroad company over the streets of said city; that said change of the premises was fraudulent, and that the premises can not be restored to their orignal state without irreparable injury to the public and a loss to the railroad company very much in excess of the value of said renewal of five years.

The ordering part of the decree is, in substance, as follows: Ordered, etc., that the railroad company pay to complainant the full value of said renewal term; that the cause be referred to Boyesen, master, to ascertain said value, the same to be ascertained from the evidence heretofore introduced in the cause, and such other evidence as the parties may introduce, and upon the assumption that the premises have remained in the condition in which they were May 3, 1886; and that, in ascertaining the ground rent to be charged to complainant, evidence is to be taken of the cash value of the premises, exclusive of improvements, October 1, 1889, and the ground rent ascertained by computing six

per cent on the value so found, in addition to the taxes and assessments stipulated for in the lease, and that the master make report of his conclusions herein, with all convenient speed.   Leave to apply for further directions.

December 16, 1893, an order was entered, by stipulation, referring the cause to Boyesen, as special master, with same power to take testimony and report conclusions as was vested in him by the former order, referring the cause to him as master.   June 14, 1898, special master Boyesen filed his report, with objections thereto by both complainants and defendants, which he had overruled.   By this report, special master Boyesen found that the damages sustained by the complainant in respect to the renewal term amounted to the sum of $39,727.50.   The objections of the parties were ordered to stand as exceptions, and, February 24, 1900, the court re-referred the matter to Boyesen, special master, with directions.   March 15, 1900, the special master filed his report on the re-reference, in which he found the damages due complainant, in respect to the renewal, to be $34,821.71.   Both parties filed objections to the report, which were overruled by the master, and were ordered to stand as exceptions.   March 27, 1900, the court entered a final decree in substance as follows :

Cause comes on to be heard upon the report of I. K. Boyesen, pursuant to the decree entered August 11, 1892, and upon the exceptions filed to objections overruled by the master; and the court overrules all exceptions so filed; and it appearing that said report conforms to the decree of the court entered August 11, 1892, and to the law and the evidence, the same is confirmed; and the cause further coming on to be heard upon the bill of complaint, the amended bill and the supplemental bill, the answers, etc., the said Boyesen's master's report, which was confirmed on August 11, 1892, and the said special master's report of said Boyesen, hereinabove confirmed, and also coming on to be heard upon the report of I. K. Boyesen, special master, to whom it was referred by an additional order of February 24, 1900, which has been filed, together with the objections of com-

plainant and defendants, and upon the exceptions to the ruling of the master thereon, it is ordered that the exceptions of complainant to the report of the master to allow simple interest on the principal amounts found due by the said reports of the master be sustained, and the report of the master in that respect is overruled; and the exceptions of the complainant to the report of the master to allow compound interest is overruled, and the report in that respect is confirmed; and the exceptions of the defendants to the said report are overruled, and the report of the master in said respect is confirmed and in all respects said report is confirmed except as before mentioned; and it appearing that the sum of $20,919.20 found to be due from the said North Chicago Street Railroad Company to the said Le Grand Company, by the said decree of August 11, 1892, as of the date of October 1, 1889, is still wholly due and unpaid, with interest thereon at the rate of six per cent per annum from October 1, 1889, until July 1, 1891, and with interest from that date to the date of this decree at the rate of five per cent per annum, that, as appears from the report of the special master, there is due as damages for the renewal term of five years, which commenced October 1, 1889, the sum of $39,727.50, which was obtained by an addition of the sum of $7,945.50 damages for each of the years of the term.

That the total has been obtained by deducting each of the annual sums to ascertain the value of the leasehold as of October 1, 1889, at the rate of six per cent per annum between October 1, 1889, and July 1, 1891, and at the rate of five per cent per annum between July 1, 1891, and October 1, 1894, making a sum of $34,821.71 due as of October 1, 1889, and that the complainant is entitled to interest thereon at the rate of six per cent per annum to July 1, 1891, and at the rate of five per cent per annum from July 1, 1891, to the date of this decree. And it appearing that the principal sums found due by the two reports are as follows, to wit—by the first report, $20,919.20, by the second report, $34,821.71, total, $55,740.91—that the interest thereon from

October 1, 1889, to July 1, 1891, at the rate of six per cent per annum, and after that date at the rate of five per cent per annum to the date of the decree, March 26, 1900, amounts to $30,200.67, making a total of $85,951.58, due for principal and interest, and it appearing that complainant was entitled to the sum last named above all offsets from said North Chicago Street Railway Company upon an accounting of and concerning the mortgage set forth in said bill of complaint, and the renewal of the lease, the court doth order, adjudge and decree that said railroad company recover from said North Chicago Street Railroad Company judgment for the sum of $85,951.58, and the costs of this suit to be taxed, and that it have execution therefor.

PENCE, CARPENTER & HIGH, attorneys for appellant.

JOHN WOODBRIDGE and SIDNEY C. EASTMAN, attorneys for appellee.

MR. PRESIDING JUSTICE ADAMS delivered the opinion of the court.

Appellant's counsel contend that the railroad company was lawfully in possession May 5, 1886, by virtue of the forcible detainer proceedings and the writ of restitution issued in pursuance thereof, and to sustain their position attack the decision of the Supreme Court in French v. Miller, 126 Ill. 611, adjudging that a judgment in forcible detainer, by confession, in pursuance of a power of attorney, is unwarranted by the statute, and that such confession confers no jurisdiction. It not being either within our province or in accordance with our inclination to overrule or disregard a decision of the Supreme Court, the contention is inappropriate and, necessarily, ineffective in this forum.

Appellant's counsel further contend that appellant was lawfully in possession May 5, 1886, by reason of its forfeiture of the lease for non-payment of rent, and its entry in accordance with the covenant of the lease for re-entry in

default of payment of rent.    By the terms of the lease the rent was payable quarterly in advance, and it was provided that if the rent reserved, or any part thereof, should be behind or unpaid on the day of payment, and for ninety days thereafter, it should be lawful for the lessor to re-enter, etc.

May 5, 1886, there was a balance of $100 rent overdue for the quarter ending March 31, 1886.    May 1, 1886, the railway company paid the taxes for the year 1885, but the lease provides that taxes paid by the lessor " shall be taken as so much additional and further rent, to be collected in the same manner, by distress or otherwise. as other rents falling due thereon."    Considering the taxes paid May 1, 1886, by the lessor, as rents, which must be done under the clause of the lease quoted, the appellee had until August 1, 1886, to pay them.    In respect to the overdue rent, $100, the evidence is that May 4, 1886, Amberg, to whom the lease had been assigned by appellee, as security, and who, therefore, had legal right to pay the rent and taxes, notified the railway company in writing that he was ready and willing to pay all rents due under the lease, if the company would notify him of the amount due; and Amberg testified that he called on Mr. Yerkes, who was then president of the railway company, and endeavored to ascertain from him the amount of rent and taxes due, but could not; also that May 5, 1886, before the railway company attempted to take possession, he again called on Mr. Yerkes, and tendered to him an amount of money, which according to his recollection, was $1,500, which Mr. Yerkes refused to receive.    Counsel for appellant contend that this tender was not made till after the railway company took possession, but we think the evidence was such as to justify the chancellor in finding the contrary.    As to the actual tender, Amberg's testimony is corroborated by that of Mr. Yerkes, who testified : .

" Well, Mr. Amberg came to see me while this trouble was brewing there in the rink building, and made me a tender of some money, just how much I don't remember,

but I do remember it was not the amount due on the rent and taxes, and I simply said to him, no, I can't take any money from you; and he went off."

Yerkes also testified that Amberg had the money with him in bank notes. The tender was refused, not because it was insufficient to pay the balance of rent due, but because it was not sufficient, as Mr. Yerkes claimed, to pay both the rent and the taxes, which latter appellee had time, until August 1, 1886, to pay, in order to prevent a forfeiture. It is not good ground of objection to a tender that it is too much, or because it does not amount to the debt due, together with another debt, which the party to whom the tender is made insists on receiving at the same time. 1 Taylor on Land. and Ten., Sec. 393.

A tender of rent due, if refused, is as effectual to prevent a forfeiture for non-payment of rent as is actual payment. Chapman v. Kirby, 49 Ill. 211.

The subsequent conduct of Mr. Yerkes, the president of the railway company, in respect to the premises, was such as to waive a forfeiture had there been one.

The evidence shows that Amberg, who was the assignee of the lease, as security for the indebtedness of appellee to him, which indebtedness was overdue and wholly unpaid, took possession of the demised premises before the railway company made any entry whatever on the premises. The assignment being of a chattel real and by way of mortgage (Jones on Chattel Mortgages, Sec. 280), Amberg had the right to take possession. 1 Jones on Mortgages, Sec. 27. And he became accountable to appellee for the rents and profits of the premises, his duty being to exercise such care and diligence in respect to the property as a provident owner would exercise. 2 Jones on Mortgages, Secs. 1114 and 1123.

It is urged that the railway company supposed that Amberg was the absolute owner of the lease; that it had no knowledge or notice that he held it merely as security. The evidence, as we think, is to the contrary. George M. Irwin, president and general manager of appellee, testified that

the written consent of the railway company to the assignment of the lease by appellee to Amberg was handed to him by Mr. Crawford, then the secretary of the railway company; that Mr. Rehm, the vice-president of the railway company, and Mr. Philbrick, appellee's secretary, were present at the time, and that he, Irwin, told Mr. Crawford that appellee owed $10,000 on construction account, and had made an arrangement with Amberg to borrow the money, and for that purpose had to offer to Amberg, in addition to appellee's other property, an assignment of the lease. Philbrick testified that he was present when the conversation with Crawford occurred, and that Irwin stated to Crawford that Amberg was willing to make the loan appellee required, provided the sale of beer on the premises should be permitted, and that he, Irwin, wanted to assign the lease to Amberg as collateral security.

Mr. V. C. Turner, who was president of the railway company at the time, testified that he signed the written consent to the assignment, but that he was not informed that the proposed assignment to Amberg was to be as a security. The following occurred in his examination in chief:

" Q.   At the time you signed that paper, or before it, were you informed, in any way, that this assignment was to be made to Mr. Amberg as security—made by him to the Le Grand Company?   A.   No, sir, I was not; indeed I don't remember that transaction, Mr. Goudy."

The witness could, of course, identify his own signature to the assent, and this was about the only value of his testimony, in view of his frank statement that he had no recollection of the matter.

The written consent of the railway company to the assignment indicates that an incumbrance of the leasehold was in the mind of the railway company's officers. The concluding words of the consent are, " and no incumbrance shall be made to affect the rights of the lessor." The language is incorrectly stated in appellant's abstract. Irwin further testified that May 3, 1886, he told Mr. Yerkes that appellee had borrowed from Amberg $10,000, and had pro-

cured from Mr. Turner, his (Yerkes') predecessor, written permission to assign the lease to Amberg as collateral security, and that appellee had so assigned it.

S. C. Eastman testified that he was present at the interview between Mr. Irwin and Mr. Yerkes May 3, 1886, and heard the former say to the latter that the lease had been assigned to Amberg as collateral security, with the assent of Mr. Turner, the previous president of the railway company.

Mr. Yerkes, in his first examination, testified that he didn't think that Mr. Irwin, May 3, 1886, informed him that Amberg had an assignment of the lease, made with the consent of the railway company, as security additional to the chattel mortgage; also that he didn't remember any conversation during which Eastman was present. On being recalled, however, he testified that he had thought over the interview inquired about, as of May 3, 1886, and remembered that Irwin and his lawyer called on him, and that he presumed it was Mr. Eastman.

Mr. Crawford merely testified that he had no recollection of being informed that. the lease was assigned as security.

The evidence fully warrants the conclusion that the Railway Company knew that Amberg held the lease merely as security, and that his possession was that of mortgagee. May 7, 1886, Amberg filed a bill against the railway company and others, and secured an injunction against interference by the railway company with his possession of the premises, and while the bill was pending and the injunction in force, Mr. Yerkes, as he testified, consulted about the matter with Mr. Moore, his attorney, who told him that Amberg was in possession and was the man to deal with, and that he also consulted with Mr. Goudy, who told him it was all right, it was the proper thing to do, after which he had a conversation with Amberg which he relates thus:

" I had a talk with Mr. Amberg and I told him we were perfectly willing to have the thing run on as it was, only we wanted to be satisfied of our rent, and I saw by the pro-

North Chicago St. R. R. Co. v. Le Grand Co.

visions of the old lease that there could be a default for three months, and we didn't feel like losing three months' rent, and if he could fix up the entire arrangement by which we could close the matter up in thirty days, that we would stop all these legal proceedings and quarreling, and he could fix the lease up just as it was, except that there should be a thirty days clause in it instead of ninety days."

Appellant's counsel contend that there was a new lease from the railway company to Amberg. The above evidence of Mr. Yerkes is all that is in the record on which to base such claim. No new lease was signed or drafted, nor was any alteration of the lease from the railway company to appellee attempted. Amberg went into possession under that lease and was in possession under it, as assignee, when the talk testified to by Mr. Yerkes occurred, which seems to have been a monologue, as it does not appear that Amberg said anything. He simply continued in possession under the lease which was assigned to him as security. Chargeable, as the railway company was, with knowledge of appellee's rights in the premises, and there having been no valid forfeiture of those rights, a new lease to Amberg would have been fraudulent and void. Mr. Yerkes substantially recognized that Amberg was lawfully in possession under the old lease, and permitted him so to remain. It appears by appellant's receipt to Amberg, of date May 12, 1886, that at that date a settlement had been made between him and the railway company. The receipt is for $100, balance of rent due for quarter ending March 31, 1886; $1,250 in full for quarter beginning April 1, 1886; $1,047.06 for taxes paid by the railway company on the demised premises. This receipt is significant. First, it admits the receipt of $100, the balance of rent for non-payment of which it is claimed the lease was forfeited; and also includes back rent for the quarter commencing April 1, 1896, although Amberg did not go into possession until May 5, 1886, all of which is inconsistent with the claim that there was a new lease. Secondly, the balance of $100 due on the quarter ending March 31st, plus $1,047.06, the amount paid by the railway company for the taxes of

1885, is less than $1,500, the amount tendered by Amberg to the railway company May 5, 1886. Amberg, at the time the receipt was given him, executed to the railway company a release of all claim for damages which he had or might have by reason of the company having taken possession of the demised premises by force or otherwise. We think it safe to assume that this release was suggested by the railway company and not by Amberg. May 24, 1886, the railway company transferred its railway system and property to the railroad company, and subsequently the latter company, desiring to use the demised premises for a power house in connection with its street railway system, entered into negotiations with Amberg, which resulted in. the agreement of June 28, 1886, set forth at large in the statement preceding this opinion. That agreement clearly recognizes the existence, at its date, of the lease from the railway company to Irwin. It is recited in the agreement that in consideration of the sum of $17,000, Amberg has sold to appellant "the said lease demising said premises to said Irwin," and "has assigned all the rights, covenants and obligations of every kind in said lease mentioned and contained, * * * it being the intent of this instrument to sell to and invest in said second party the said lease and all the covenants and all the obligations of the same, and to sell and convey to the said second party the said improvements and property now in and upon said premises."

In view of the language of the agreement and the fact that appellant paid $17,000 to Amberg in consideration of the sale and assignment to it, any other conclusion than that the agreement was made and the money paid by appellant on the hypothesis that the lease was in full force and effect, seems to us absurd. Appellant took possession of the premises under the agreement of June 28, 1886, and has ever since continued in such possession. Amberg's title being only that of assignee of the lease, by way of mortgage, he had no right to sell it at private sale, as if he were the absolute owner, and his attempt so to do was fraudulent; and appellant, well knowing that Amberg was merely a

mortgagee in possession, and not the absolute owner of the term, participated in the fraud, by taking possession of the demised premises, claiming to own them, and appropriating them to its own use for railway purposes.

We are therefore of opinion that appellant, as held by the chancellor, must be regarded as mortgagee wrongfully in possession, and chargeable as such.   Russell v. Southard, 12 How. 139; Huxley v. Rice, 40 Mich. 73; Hancock v. Harper, 86 Ill. 445, 451; Incorporated Societies v. Richards, 1 Drury & Warren, 266; National Bank, etc., v. United Hand in Hand, etc., 4 House of Lords (App. Cases), 391; Booth v. Baltimore Steam Packet Co., 63 Md. 39.

The railroad company substantially destroyed the premises for the use for which appellee intended them, or for any general use to which they were adapted.   Mr. Yerkes testified :

" After the assignment of the lease to us by Amberg, we went on and improved the property, put in a cable station, put in foundations for engine and boilers, put up the big stack, put in the engine, the winding machinery and vaults and made different apartments in the building by partitioning them off, and generally doing the work necessary for the cable station.   The engines necessary to run everything north of Illinois street are on this property.   We have expended from $275,000 to $300,000 on this property."

The decree confirmed the master's report, finding the amount with which appellant was chargeable for the unexpired part of the term, ending September 30, 1889, to be $20,919.20 and interest, amounting in all to $32,256.22. Counsel for appellant contend that this amount is excessive, and their argument is mainly directed to criticism of the master's statement of the reasons for his conclusion as to the amount properly chargeable to appellant.   The directions of the court, in referring the cause, were " to take an accounting of and concerning said premises   *   *   *   and that the said master report his finding to this court with all convenient speed."   Under this order it was the duty of the master merely to report his findings.   He was not required to make an argument, state reasons for his findings, or

describe the mental processes by which he arrived at them, and such statement must, as it seems to us, be regarded as extra official. The question is, whether his findings are supported by the evidence. The master's findings have been confirmed by the court, and after carefully reading and considering the evidence, we can not say that the finding as to the amount chargeable to appellant, under the original bill, is manifestly against the evidence.

We will next consider the decree in respect to the breach of the covenant to renew.

The court, by the decree of August 11, 1892, on the supplemental bill, decreed:

" That said change of said premises and their application to the purposes aforesaid were fraudulent; that said premises can not be restored to their original state without irreparable injury to the public, nor without causing a loss to said railroad company many times in excess of the said renewal term of five years.

And it further appearing to the court that the equities of this case demand that the said complainant shall receive and that the said street railroad shall make compensation to the said complainant in money for the value of said renewal of five years, and that such value shall be ascertained before entering the final decree herein, it is further ordered, adjudged and decreed, that the said street railroad company pay to said complainant the full value in money of the said renewal term of five years, and that this cause be referred to I. K. Boyesen, master, to ascertain said value, and that said value be ascertained by the evidence heretofore introduced in this cause, and by such other evidence as complainant and the said street railroad company may introduce, and that said value be ascertained upon the assumption that the said premises have remained in the same condition in which they were May 3, 1886."

To determine what were to be the terms of the renewal lease, we must refer to the original lease, which contains this clause:

" It is further covenanted and agreed that said party of the second part shall be entitled to a renewal of this lease for a further term of five years from October 1, 1889, at an annual rental equal to six per centum of the value of said land, exclusive of improvements thereon, to be determined

by a majority of three disinterested persons, as appraisers, (one of whom shall be chosen by said party of the first part, one by said party of the second part, and the third by the two so chosen,) payable quarterly in advance, and also all taxes and installments of the Lincoln Park assessment which may be assessed or payable during said term, and upon the same terms and conditions in other respects as are contained herein, except this renewal clause."

We are of opinion that the renewal lease covenanted to be made, is a lease the same in all respects as the executed lease, except that it was not to contain the above covenant for renewal, and except, also, that instead of the covenant to pay quarterly, in advance, the rent reserved by the executed lease, it was to contain a covenant to pay an annual rental amounting to six per cent of the value of the land, such value to be ascertained as stated in the covenant; such six per cent to be inserted in the renewal lease when ascertained, as the annual rental, to be paid quarterly. In other words, if the value of the land, exclusive of improvements, should be appraised at $100,000, then $6,000 should be inserted in the lease as the annual rent, to be paid quarterly, in advance. Suppose a bill to have been filed for specific performance of the renewal covenant, the court, as it seems to us, in granting the relief prayed, could not legally have decreed the execution of a lease different in terms from the original lease, except as expressed in the renewal covenant.

Counsel for appellee contend that the permission given by the railway company January 21, 1886, to assign the lease to Amberg, and to sublet the premises for a summer garden, or other purposes not calculated to injure the reputation of the property, was a waiver, as counsel express it, for all time, of the covenants against assigning or subletting. In support of this contention, counsel rely mainly on Dumfor's case, 1 Smith's Leading Cases, 119. It was held in that case that if the lessor of premises licensed alienation of the demised premises, the condition or covenant against alienation was determined, and that there could be no re-entry for a subsequent alienation during the term. If it be conceded that the decision in Dumfor's case is law, we

do not think it applicable to the covenant for renewal in question. The case merely decided that the condition was gone for the term. In the present case the covenant is for renewal on the terms of the executed lease, with the exceptions mentioned, and a waiver of condition during the term is not in the least inconsistent with the contract for renewal on the terms of the executed lease. The only estate which, in the present case, the appellee could assign or sublet, was the term created by the original lease, and, consequently, that estate was the only one in respect to which the license to assign or sublet could operate. The right to a renewal is not an estate. Sutherland v. Goodnow, 108 Ill. 528.

We have examined other authorities cited by counsel for appellee in support of its contention, and find that they all relate merely to licenses to assign or sublet pending the term, and therefore, for the reasons above stated, are inapplicable to the facts of the present case. The decision in Dumfor's case has been severely criticised by Washburn in his work on Real Property, and his criticism has been quoted by the Supreme Court with seeming approval. Kew v. Trainor, 150 Ill. 150.

Although that decision was long adhered to in England, this was solely on account of the rule *stare decisis*. Eminent English judges, among them Sir James Mansfield, Chief Justice of the Common Pleas, and Lord Eldon, while following, disapprove it, and finally it was obliterated by 22 and 23 Victoria, Chap. 35, and 23 and 24 Victoria, Chap. 38. A decision regarded by the English bench and bar so unreasonable as to warrant resort to legislation to eliminate it from the body of English law, will hardly be followed in this State. The renewal lease, then, would have contained the restrictions against assignment and subletting, against using the premises for the manufacture or sale of liquor, and against removing from or altering the buildings, or other permanent improvements on the premises, without the written consent of the lessor; and also the provision that any permanent improvements placed on the premises should, at the expiration of the lease, belong to the lessor.

North Chicago St. R. R. Co. v. Le Grand Co.

We think it obvious from the decree of August 11, 1892, that the court, on account of the public inconvenience and the great loss which would accrue to appellant by decreeing the redemption, decided to allow the value of such renewal as of October 1, 1889, when the breach occurred. In other words, to allow such an amount as appellee would be entitled to recover by action at law for the breach of the covenant to renew.   The concluding part of the decree is as follows:

" That as to the ground rent to be charged to complainant, evidence is to be taken as to the cash value of the premises, exclusive of improvements October 1, 1889, and the ground rent ascertained by computing six per cent per annum on the value so found, in addition to the taxes and assessments stipulated for in the lease."

The measure of damages in an action at law for a breach of contract to execute a lease is " the difference between the rent to be paid and the actual value of the premises at the time of the breach."   Green v. Williams, 45 Ill. 206, 208, citing numerous authorities; Cilley et al v. Hawkins, 48 Ib. 308; City of Chicago v. Huenerbein, 85 Ib. 594; Loyd v. Capps (Tex.). 29 S. W. Rep. 505.

Cilley v. Hawkins was a suit for breach of contract to lease lands.   The court say :

" In such a case the true inquiry is as to the value of the lease at the time the breach occurred.   Such terms necessarily have a present market value, like other estates and interests in real estate, and the inquiry should have been, what was its true worth ? for how much could the plaintiffs in error have sold it to any one desiring to purchase ?   Not how much any person might imagine could have been made by its enjoyment."

It is obvious that in determining the value of the lease, reference must be had to its terms, conditions and restrictions, as these might largely affect its value.   The question, an answer to which was to be found by the master, under the order of reference, was, what was the value of a renewal lease of the premises in question October 1, 1889, considering the premises in the condition in which they were May

3, 1886, and also that said renewal lease was to be identical in terms with the executed lease, except the covenant for renewal, and except also, that the annual rent was to be six per cent of the value of the land October 1, 1889, exclusive of improvements.

The order of reference, in express terms, excluded considerations of value, on any other hypothesis than that the premises were to be considered as they were May 3, 1886, and properly so, as we think. The language is:

"That said value be ascertained upon the assumption that the said premises have remained in the same condition as they were May 3, 1886."

The exact date, May 3, 1886, is not very material, because the evidence is that June 28, 1886, when appellant took possession under the agreement of that date, the premises were in substantially the same condition as in May, 1886. The order of reference, as well as the law, excluded consideration of imaginary profits which might have accrued to a tenant of the premises by additional improvements, or altering those already of the premises. Green v. Williams, and City of Chicago v. Huenerbein, *supra.*

The evidence on the reference was substantially as follows: Henry L. Goldy, for complainant, testified that he considered the value of the premises for the five years commencing October 1, 1889, omitting consideration of light and heat, to be $55,250; and that he considered the gross rental value of the rink part alone, assuming it to be 210 by 150 feet, to be $93,000. On being asked how he arrived at those figures, he answered that he compared it with his property further north, as to what it could be used for, like theatre purposes; that taking sixty feet from the front for retail stores would leave about ninety by 203 feet on the rear for theatrical purposes; that to do this the old building would have to be partitioned off and the space divided into stores, which would probably cost in the neighborhood of $5,000; that so changed, the rental value of such part of the rink as was not devoted to stores, would be about $15,000 per annum, and the stores would rent for about $50 per

month.    Value of land, exclusive of improvements, October 1, 1889, $350 per front foot.

John H. Rogers, for complainant, having testified that during the last five years before testifying he was pretty familiar with property in the vicinity, and that he had charge of property near the property in question, called "Engel's Opera Pavilion," which he describes as having a saloon in front and the pavilion in the rear, testified that the rink part of the premises in question would have been, during the last five years, available for vaudeville, operas, or something of that kind; that he thought tenants could easily have been procured who would use it for such purposes, and that he thought its rental value for five years, commencing October 1, 1889, was $20,000 per annum.

Herman Benze, for complainant.    This witness, on the reference of the original bill to the master, testified that the net value of the lease for eight years from May 3, 1886, was $17,200 per annum; also, that he had never been concerned in renting such a place.    On his examination on the reference of the supplemental bill, he testified that the net rental value October 1, 1889, was $20,000 per annum.    Value of ground October 1, 1889, $250 per foot.

Percy Palmer, for complainant, in his examination on reference of original bill, testified that a fair rent for the whole property, commencing May 3, 1886, and down to the time he testified, July, 1888, was $16,500 per annum.    On the reference of the supplemental bill he testified, July, 1894, that "to-day I should think that $20,000 per year income would be about right;" that the ground rent and cost of repair would have to be deducted from that amount.    Value of ground October 1, 1889, $300 per front foot.    Says in 1888 he was of opinion that the premises should have netted $16,000 per annum.    On cross-examination he testified that the premises should net $20,000 per annum over everything except ground rent.

Adolph Engle, for complainant, manager of Engle's Opera Pavilion, testified that if he wanted the premises for purposes similar to those for which the pavilion was used, he

would probably offer $12,000 per annum; also, that he was not acquainted with rental values in the market, and could not satisfactorily answer what the rental value of the premises in the market was October 1, 1889.

The following question was put to Dunlap Smith, Edward S. Dreyer, Anthony Schiller, Henry Tift and W. B. Frankenstein, witnesses for appellant, and the following answers given by said witnesses, respectively:

Q.   " Assume that the improvements upon the premises in question, and their condition, on October 1, 1889, was substantially as follows, to wit:    That on the corner having a frontage of 207 feet and 6 inches on Clark street, by 150 feet on Elm street to the alley, was a brick building fitted up and theretofore used for a skating rink; that such building was one story in height, except on the corner of the street, where it was two stories in height, the second story having a frontage of 60 feet and 6 inches on Clark street, by 29 feet and 9 inches on Elm street, and that such second story was constructed so as to be adapted for use as a photograph gallery; assume further that said skating rink covered 31,125 square feet, and said photograph gallery 1,799⅞ square feet.    Assume further that adjoining the rink on the south was a natatorium, fronting 46 feet and 4 inches on Clark street, running the full depth of the lot to the alley, covering 6,950 square feet, and that south of and adjoining the natatorium, and taking up the balance of the frontage, being 85 feet and 6 inches, was a brick storage warehouse, with wooden partitions, running east and west through the same, which storage warehouse ran to the alley, covering 10,210 and 13-29 square feet, and that in the northeast corner of the storage warehouse was a room occupied by a lessee whose lease was to expire on the 1st of October, 1890, for an electric light plant, a part of which was 38⅔ feet wide by 33½ feet deep, and the remaining part of which was 46¼ feet wide by 28½ feet deep, the whole covering 2,614 and 11-24 square feet, and that said wide end of said space fronted on the alley.    What, in your judgment, was the full value in money, if anything, on the first day of October, 1889, of the lease of said premises, for the term of five years from said 1st day of October, 1889, assuming that the value of said lease be charged with the rent of the ground covered by said improvements, during said term, and that said ground rent was to be six per cent per annum on the cash value thereof, exclusive of improvements, on

October 1, 1889, in addition to the taxes and installments of the Lincoln Park assessment to be assessed or payable during said term of five years?"

Dunlap Smith:   A.   "I do not believe that it had any market value whatever, for the reason that I do not think the property could be rented for enough, during the five year term, to discharge the obligations of the lease in the way of taxes and interest, ground rent, and the cost of remodeling, in order to get the best rent out of it, to pay those expenses and charges."

E. S. Dreyer:   A.   "In my opinion such a lease would not have sold for one dollar in the market.   To the contrary, it is my firm belief that if a man had had such a lease on said premises for five years, he might thank his stars if somebody had taken it off his hands."

Anthony Schiller:   A.   "I don't think it would have been of any value at all."

Q.   "Do you think, Mr. Schiller, if such a lease had been put on the market at that time, it could have been sold for anything whatever?"   A.   "No, sir, there could have been no purchaser found, I believe."

W. B. Frankenstein:   A.   "None, in my opinion.  In view of all the expenditures you say, and the liability of assessment, I do not believe that that lease could have been disposed of at all, for any bonus."

Q.   "Did it have any cash value at that time, that is, over and above the charges?"   A.   "The lease itself?"

Q.   "Yes."   A.   "None, in my opinion."

Henry Tifft:   A.   "I would not have given anything for it, and I do not think that I could have found anybody else that would have given anything for it, and I don't think anybody would have bought it.   I don't think it had any market value."

None of the witnesses named were cross-examined as to their testimony that the lease was of no market value.   No objection was made to the question put to these witnesses, and the question being as to the value of the lease October 1, 1889, was the question to be determined, as held by the court in Cilley v. Hawkins, *supra.*

After the witnesses above named had testified, appellee called Frank A. Warner, who testified that he was in the storage warehouse business, and that the storage warehouse on the premises in question would not, in his opinion, be a profitable investment.

Goldy and Rogers, appellee's witnesses, did not testify as to the rental value on the hypothesis that the premises were to be considered as remaining in the condition in which they were May 3, 1886, but evidently on the hypothesis that they might be materially changed. Palmer did not testify as to rental value October 1, 1889, but to such value at the date of his testimony, July 12, 1894. Benze evidently testified July 7, 1894, on the theory that rents had increased since October 1, 1889, and added a percentage to his estimate on the former reference.

None of complainant's witnesses testified as to the value of the lease on the market October 1, 1889, the very question at issue. Evidence given on the reference of the original bill as to rental values, at a time when the restrictions as to subletting and assigning had been removed for the then existing term, and permission given to sublet the premises for a summer garden, which means a garden where beer and other liquors are sold and drank, could throw little, if any, light on the question of the market value of the lease October 1, 1889, containing all the restrictions and conditions of the executed lease. We are of opinion that the master's report as to the value of the renewal lease is not supported by the evidence, and that it is manifestly against the weight of relevant evidence.

Such being our opinion, we deem it unnecessary to consider other objections made by appellant's counsel in respect to the matter of the renewal lease.

The court decreed the payment of $20,919.20, the principal sum found due by the master October 1, 1889, on the reference of the original bill, with interest at the rate of six per cent per annum from October 1, 1889, till July 1, 1891, and at the rate of five per cent per annum from July 1, 1891, till March 27, 1900, the date of the decree, which amounts, principal and interest, to the sum of $32,256.22. Counsel for appellant object to the allowance of interest from October 1, 1889. We find no valid objection to the allowance of interest. October 1, 1889, the breach occurred, and then the value of the renewal lease was payable.

Appellee's counsel have assigned, as cross-errors, that the court erred in setting aside the report of Waller, master, and in not allowing compound interest on the amount found due to appellee under the original bill. We can not sustain these assignments.

On the appellee remitting $53,695.36 from the amount decreed within twenty days from this date, the decree will be affirmed as to the remainder, namely, the sum of $32,256.22; otherwise the decree will be reversed and the cause remanded. Appellant to recover its costs in either event, affirmed on remittitur; otherwise reversed and remanded.